Savas SUZAL, Appellant,

v.

**DIRECTOR, UNITED STATES INFORMATION AGENCY,**
et al.

No. 92–5258.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 3, 1993.

Decided Aug. 12, 1994.

Zona F. Hostetler, Washington, DC, argued the cause and filed the briefs for appellant.

R. Craig Lawrence, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty., John D. Bates, Asst. U.S. Atty., and Carol B. Epstein, Asst. Gen. Counsel, U.S. Information Agency, Washington, DC.

On the brief for amicus American Federation of Government Employees, Local 1812, were Katherine Sciacchitano, Walter A. Smith, Jr., Denise P. Lindberg and Roderic V.O. Boggs, Washington, DC.

Before: WALD, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge WILLIAMS.

Part II.C. of opinion for the court filed by Circuit Judge BUCKLEY.

Separate concurrence as to Part II.C. filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge.

Savas Suzal has appealed the district court's dismissal of his lawsuit against his former employer, the Voice of America. We do not review the district court's decision that Suzal's claims fail on the merits, for we conclude that the district court should not have exercised jurisdiction over the case. Accordingly, we vacate the district court's orders and remand the case with instructions to dismiss.

## I. Facts and Procedural History

The Smith–Mundt Act permits the United States Information Agency ("USIA") to "employ, without regard to the civil service and classification laws, aliens within the United States and abroad for service in the United States related to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs...." 22 U.S.C. § 1474(1). In 1980, under this authority, the Voice of America—a component of USIA— hired Suzal as an International Radio Broadcaster for its Turkish Service. Suzal resigned his job as a news anchorman for Turkish Radio and Television, Turkey's state-operated network, and moved to America with his family. After successfully completing a probationary period of 90 days under a personal services contract with the Voice of America, Suzal began a series of one-year appointments.

In 1987, the Voice of America decided not to renew Suzal's appointment when it expired on April 30. Suzal's union, Local 1812 of the American Federation of Government Employees, filed a grievance on his behalf seeking his reinstatement and other relief. When the Voice of America asserted that Suzal's nonrenewal was not subject to the grievance procedure, the parties submitted to arbitration, as required by their collective bargaining agreement. The arbitrator decided that the nonrenewal of Suzal's appointment was indeed subject to the grievance procedure, and hence to arbitration. On the merits, he found that the Voice of America would have renewed Suzal's appointment if he had not helped a colleague pursue a grievance against the agency in 1986. The arbitrator ordered Suzal's reinstatement with back pay, and the agency complied.

Soon thereafter, Suzal sought permission from the Voice of America to moonlight as a paid stringer for *Sabah,* an Istanbul daily. Subject to some conditions, the Voice gave its approval. Suzal served as a stringer for a while and then became *Sabah*'s Washington correspondent.

In July 1990 Suzal heard a Voice of America program about Turkey on his home shortwave radio. During the program, which could be heard in Turkey in both English and Uzbek (though not in Turkish), Voice of America employee Ed Warner said that the thawing of the Cold War had put Turkey's role in NATO "in question", since the country no longer was "the vital southern flank bordering a threatening Soviet Union". Joint Appendix ("J.A.") 73. Suzal summarized this program in an article for *Sabah.* As translated from the Turkish in an affidavit filed on Suzal's behalf in the district court, the article's lead sentence said: "The U.S. government controlled VOA broadcast that, with the ending of the cold war, and the transformation of NATO into a political organization, Turkey has lost its one time importance." Affidavit of Yildiz Agnello (filed May 8, 1991). *Sabah*'s editors gave the article a headline declaring, "The Voice of America broadcasts: 'Turkey is no longer important!'" According to a smaller teaser, also written by the editors, "The Bush administration-controlled Voice of America said in its news commentary, 'Turkey's importance in NATO is ending as NATO ends.'"

Suzal's bosses apparently did not object to the spin that Suzal himself put on the Warner broadcast; in an electronic-mail message transmitted on the day that the article was

published, Turkish Service Chief Dinjer Aktug expressed concern about the headlines but declared that the body of the article "remains true to Warner's piece". J.A. 77. Nonetheless, on August 15, 1990, the Chief of the Voice's Office of External Affairs sent Suzal a memo raising the possibility that Suzal had violated the conditions under which the Voice of America had approved his outside writing. The memo rescinded Suzal's authorization to work for *Sabah* "pending outcome of further investigation into this matter". J.A. 79. Despite this directive, Suzal continued to write his twice-weekly stories for *Sabah*.

After Suzal had an unsuccessful meeting with Voice of America officials, Zona Hostetler—Suzal's current counsel—was named his union representative for purposes of the grievance process. Suzal and Hostetler had extensive discussions with Voice of America officials on two separate days near the beginning of 1991, at a time when the Voice apparently was considering firing Suzal outright. Eventually, however, the agency decided simply not to renew Suzal's appointment when it expired on April 30, 1991.

The day before his appointment was scheduled to expire, Suzal filed suit in federal district court. His complaint alleged that his prospective nonrenewal sprang from the Voice of America's continuing effort to retaliate against him for his involvement in the 1986 grievance and for his success in the subsequent arbitration. J.A. 14. In the alternative, it alleged that the cause of his nonrenewal was his failure to submit his *Sabah* articles to the Voice of America for prepublication clearance, and that the Voice of America's alleged insistence that he do so violated the First Amendment. J.A. 22. Suzal further claimed that he had been denied procedural rights guaranteed by the civil service laws, the collective bargaining agreement, and the Constitution. J.A. 23.

At Suzal's request, the district court granted a temporary restraining order, and then a preliminary injunction, preventing the Voice of America from terminating his employment. Though the court concluded that Suzal had no procedural rights under the civil service laws because he had been hired "without regard to" those laws under the Smith–Mundt Act, 22 U.S.C. § 1474(1), it did find a substantial likelihood that Suzal would prevail on his First Amendment theory. J.A. 26–47.

But the court soon changed its mind. Though it had initially focused on indications that Suzal's nonrenewal stemmed from his refusal to submit his articles to the Voice of America for prepublication clearance, the court decided that this claim was a red herring; instead, the reason the agency allowed Suzal's appointment to expire was his disobedience of the August 15 memo rescinding his permission to write for *Sabah*. The court decided that the August 15 directive had been issued because Suzal had violated the conditions originally placed on his ability to publish with *Sabah*, and that those conditions did not violate the First Amendment. Concluding that Suzal's First Amendment theory was unlikely to succeed, the court dissolved the preliminary injunction on June 28, 1991. J.A. 48–58.

A week later the Voice of America notified Suzal that his appointment would not be renewed, and he ceased working for the agency. A meeting with Voice of America officials proved fruitless, and in January 1992 the agency notified Hostetler that it had reached a "final decision" against reinstating Suzal. J.A. 169–77.

In May 1992, finding that the "essential facts" were *no different than they had been* when it dissolved the preliminary injunction, the district court rejected Suzal's First Amendment theory. It also reiterated its earlier conclusion that the Smith–Mundt Act excluded Suzal from the protections of the civil service laws. The court accordingly granted the defendants' motion to dismiss. Leaving open the possibility that Suzal could persuade the Merit Systems Protection Board ("MSPB") to take a different view of the applicability of the civil service laws, however, it ordered that the dismissal be without prejudice to Suzal's ability to seek relief from the MSPB. J.A. 64–71.

On appeal to this court, Suzal takes issue with the district court's First Amendment analysis. Either his *Sabah* articles did not

violate the conditions under which he received permission to moonlight, Suzal argues, or those conditions were unconstitutional as applied to him. Suzal adds that the Voice of America violated the Fifth Amendment by depriving him of a property interest—his interest in continued employment—without due process of law. Finally, he continues to assert rights to relief along other avenues—both through arbitration under the collective bargaining agreement and through the MSPB under the civil service laws.

## II. Exhaustion

Though the government does not contest our jurisdiction (or that of the district court), we are obliged to examine the issue for ourselves. Here, possible want of jurisdiction turns on the availability of alternative avenues of relief. If Suzal is correct that he had a statutory remedy or a right to arbitration, we must ask whether he was required to exhaust those routes before coming to court. We conclude that Suzal had no statutory remedy, but that his collective bargaining agreement did allow him to challenge his nonrenewal in arbitration. We further conclude that he failed to exhaust this arbitration remedy. My colleagues and I split at this juncture: I believe that this failure ousts the courts of *jurisdiction*, while my colleagues believe that exhaustion was merely a *prudential* requirement in this case. We all agree, however, that the district court should have dismissed this case without reaching the merits, and we remand for that disposition.

### A. *Suzal had no statutory avenues of relief.*

■ Suzal came to court insisting that he could appeal his nonrenewal to the MSPB, but he never filed such an appeal. Nor did he seek relief through the Office of Special Counsel established by 5 U.S.C. § 1211 to police "prohibited personnel practices" in federal agencies. But his failure to pursue these statutory avenues of relief has no significance here. Under the Smith–Mundt Act, Suzal was employed "without regard to the civil service ... laws", 22 U.S.C. § 1474(1), and so the administrative rights and remedies established by those laws were inapplicable to him.

■ The Smith–Mundt Act could conceivably be read differently. One of the key divides in the civil service is between employees in the "competitive" service, who enjoy a variety of procedural and substantive rights, and employees in the "excepted" service, who traditionally have been less protected. For the most part, appointive positions in the executive branch are in the "competitive" service unless specifically exempted from it by statute, in which case they are in the "excepted" service. See 5 U.S.C. § 2101(1) (defining "civil service" to include all appointive positions in the executive branch, other than those in the uniformed services); *id.* § 2102(a)(1) (defining "competitive service" to include all civil service positions in the executive branch that are not in the Senior Executive Service, subject to Senate confirmation, or specifically excepted from the competitive service by statute); *id.* § 2103(a) (defining "excepted service" to include all civil service positions that are not in the competitive service or the Senior Executive Service). One court has appeared to give language of the sort found in the Smith–Mundt Act a limited interpretation, viewing an appointment made "without regard to the ... civil service laws" as if it were simply an appointment in the excepted service rather than the competitive service. *Dodd v. Tennessee Valley Auth.*, 770 F.2d 1038 (Fed.Cir. 1985) (interpreting 16 U.S.C. § 831b). But the *Dodd* court did not consider whether such appointees were outside the civil service laws altogether. At least as applied to the Smith–Mundt Act, moreover, it would distort the statutory language to hold that people employed "without regard to the civil service ... laws" actually are covered by all the civil service laws applicable to members of the excepted service.

Suzal's appointment was in the excepted service in one sense, to be sure—the sense that it was not in the competitive service or the Senior Executive Service. See *Basic Federal Personnel Manual* 212–3 (1992) ("The excepted service includes all other civilian positions, whether or not they are subject to other chapters of title 5."). Indeed, USIA's own *Manual of Operations & Administration* called for employees hired un-

der the Smith–Mundt Act to be given "excepted" appointments (albeit appointments designated "GG" instead of the normal "GS") after successfully completing their initial probationary period, see § 821.4(a), and Suzal's personnel forms described him as a member of the excepted service, see J.A. 103. But this designation does not mean that Suzal enjoyed all the protections available to other excepted-service employees. To the extent that those protections stem from "the civil service ... laws", we agree with the Ninth Circuit that they are unavailable to people employed "without regard to" those laws. See *Orloff v. Cleland*, 708 F.2d 372, 375–77 (9th Cir.1983) (interpreting what is now 38 U.S.C. § 7405(a)). And the Civil Service Reform Act of 1978 ("CSRA"), which sets out the administrative appeal rights of federal employees, is nothing if not a "civil service law". We conclude, therefore, that the CSRA gave Suzal no avenues of relief, and hence that he had no statutory procedures to exhaust before coming to court.

### B. *Suzal had arbitration rights that he failed to exhaust.*

While Suzal had no access to the statutory procedures, we conclude that he did fail to exhaust available arbitration rights.[1] This finding involves three steps. First, the language of the collective bargaining agreement between Local 1812 and the USIA gave Suzal arbitration rights. Second, that grant was not beyond the authority of the USIA, notwithstanding our decision in *Department of the Treasury, Office of Chief Counsel v. FLRA*, 873 F.2d 1467 (D.C.Cir.1989). Third, Suzal failed to exhaust these arbitration rights.

### 1. *The Collective Bargaining Agreement purported to give Suzal arbitration rights.*

Suzal was included in the bargaining unit covered by the collective bargaining agreement between Local 1812 and USIA, see Collective Bargaining Agreement ("CBA"), Article II, § 1 (noting that bargaining unit

includes "[a]ll non-professional and professional non-supervisory domestic General Schedule (GS & GG) ... employees of USIA nationwide", with exceptions not applicable to Suzal); cf. *id.*, Article XVI, § 3(b)(2) (observing that Smith–Mundt appointees "shall be assigned to positions identified as pay plan GG"), and under the terms of that agreement he could pursue grievances through the negotiated procedure even though he was outside the protection of the civil service laws, see *id.*, Article XXIII, § 2(a) (entitling "any employee" to file a grievance). If dissatisfied with the Voice of America's disposition of his grievances, he could ask his union to invoke arbitration on his behalf. See *id.* § 5(d).

 The negotiated procedure, though not open to all conceivable complaints, did cover Suzal's. Using terms of art whose meaning derives from the CSRA, the collective bargaining agreement defined grievable matters to include "prohibited personnel practices" as well as "adverse actions and removals for performance". *Id.* § 2(a). We agree with the Voice of America that the expiration and nonrenewal of an appointment for a specified term is not a "removal", and hence that it is not an "adverse action" either. See 5 U.S.C. § 7512 (effectively defining "adverse actions" to include removals, suspensions, reductions in grade or pay, and furloughs); *Berger v. Department of Commerce*, 3 MSPB 297, 297–98, 3 M.S.P.R. 198 (1980) (holding that the expiration and nonrenewal of a term appointment is not an "adverse action"); cf. *National Treasury Employees Union v. MSPB*, 743 F.2d 895, 912–15 (D.C.Cir.1984) (holding that short-term layoffs of seasonal employees in accordance with conditions agreed upon at the start of employment are not "furloughs" within the meaning of § 7512). But both of Suzal's theories about why the Voice of America declined to renew his appointment allege "prohibited personnel practices" within the meaning of the collective bargaining agreement. It is a "prohibited personnel practice" to refrain from reappointing or reinstating someone because he lawfully helped a col-

---

1. The line between "statutory procedures" and "arbitration rights" is somewhat artificial, for the CSRA certainly pushes federal agencies to establish arbitration procedures. See 5 U.S.C. § 7121. But we will use this terminology for ease in exposition.

**580**

league exercise grievance rights. 5 U.S.C. § 2302(b)(9). And our cases make clear that it is a "prohibited personnel practice" to refrain from reappointing or reinstating someone because he ignored unconstitutional restrictions on his freedom of speech. See *id.* §§ 2302(b)(11), 2301(b)(2); *Spagnola v. Mathis,* 859 F.2d 223, 225 & n. 3 (D.C.Cir. 1988) (en banc); accord *Ferry v. Hayden,* 954 F.2d 658, 661 (11th Cir.1992); *Saul v. United States,* 928 F.2d 829, 834 (9th Cir. 1991); *McIntosh v. Turner,* 861 F.2d 524, 526 (8th Cir.1988).

■ To be sure, as required by 5 U.S.C. § 7121(c)(4), the collective bargaining agreement excludes from the negotiated procedure any grievance concerning an "examination, certification or appointment". See CBA, Article XXIII, § 2(b)(4). But we read the word "appointment" in the context of both statute and agreement to refer only to *initial* appointments, not to reappointments. The FLRA appears to agree. See, e.g., *National Fed'n of Fed. Employees Local 1636 v. United States Dep't of Defense, Nat'l Guard Bur.,* 48 FLRA 511, 513–14 (1993); *United States Dep't of Defense, Office of Dependents Schools v. Overseas Educ. Ass'n,* 45 FLRA 1411, 1415–17 (1992); cf. *Brammer v. United States,* 24 Cl.Ct. 487, 492 (1991). In our view, then, the collective bargaining agreement purports to give Suzal the right to submit his nonrenewal to the negotiated grievance procedure on both his reprisal theory and his First Amendment theory.

2. *Since Suzal's nonrenewal was not an "adverse action", USIA could lawfully agree to let him challenge it through arbitration.*

■ In response to our request for supplemental briefing, the parties seem to agree that if Suzal was not covered by the CSRA, then it was *ultra vires* for USIA to give Suzal the right to challenge his nonrenewal through arbitration. But jurisdiction cannot be conferred by consent, and we disagree with the parties about the scope of the controlling decision, *Department of the Treasury, Office of Chief Counsel v. FLRA,* 873 F.2d 1467 (D.C.Cir.1989).

Under the version of the CSRA in effect at the time of *Office of Chief Counsel,* members of the competitive service and "preference eligible" members of the excepted service could appeal "adverse actions" (other than minor suspensions) to the MSPB. But non-preference eligible excepted-service employees—that is, members of the excepted service who were not veterans or close relatives of veterans, see 5 U.S.C. § 2108(3)—had no such right. A union representing some of these so-called "NEES" employees nonetheless demanded that the Treasury Department bargain over a proposal to let them challenge major adverse actions through arbitration. We held that the agency had no obligation to bargain over this topic.

Of course, our holding in *Office of Chief Counsel* does not by itself compel the conclusion that Congress barred agencies from deciding, of their own accord, to agree to let NEES employees go to arbitration over major adverse actions. Indeed, we said later that *Office of Chief Counsel* found no such bar. *Steadman v. Governor, U.S. Soldiers' & Airmen's Home,* 918 F.2d 963, 966 n. 4 (D.C.Cir.1990). One might well argue that Congress merely wanted agencies to be free of mandatory bargaining that could push open the door to arbitrability. But the logic of *Office of Chief Counsel* was broader, for we concluded that "Congress intended these excepted service employees to have no right to arbitral review". *Office of Chief Counsel,* 873 F.2d at 1468; accord *Department of Health & Human Servs. v. FLRA,* 894 F.2d 333, 334 (9th Cir.1990); *United States Dep't of Health & Human Servs. v. FLRA,* 858 F.2d 1278, 1284 (7th Cir.1988). We agree with the parties that *Office of Chief Counsel* strongly suggests that an agency cannot let its employees challenge major "adverse actions" through arbitration when Congress has specifically precluded them from appealing such actions to the MSPB.

But *Office of Chief Counsel* should not be read too broadly. The CSRA itself assumes that employees often will have access to arbitration even when they lack any statutory avenues of relief. It gives each "employee"—defined to include almost anyone "employed in an agency", see 5 U.S.C.

§ 7103(a)(2)(A)—the right to join a union and (through union representatives) "to engage in collective bargaining with respect to conditions of employment". 5 U.S.C. § 7102. It then *requires* the collective bargaining agreements that agencies sign to "provide procedures for the settlement of grievances, including questions of arbitrability". 5 U.S.C. § 7121(a)(1). Though they may "exclude any matter" from the negotiated procedure's coverage, *id.* § 7121(a)(2), and indeed must exclude some specified matters, *id.* § 7121(c), the agreements have to provide that any covered grievance not "satisfactorily settled" under the negotiated procedure "shall be subject to binding arbitration" that can be invoked by either the union or the agency, *id.* § 7121(b)(3)(C). And the CSRA defines "grievance" extraordinarily broadly, to include (among other things) "any complaint by any employee concerning any matter relating to the employment of the employee". *Id.* § 7103(a)(9)(A).

In keeping with its broad definitions of "grievance" and "employee", the CSRA goes on to set out certain rules that apply *except* when a matter covered by the negotiated grievance procedure is also covered by a statutory procedure. See *id.* § 7121(a) (making negotiated grievance procedure the exclusive means of resolving covered grievances "[e]xcept as provided in subsections (d) and (e) of this section", which address grievance procedures that overlap with statutory remedies for "prohibited personnel practices" and "adverse actions"); *id.* § 7116(d) (creating another special exception where matters that can be raised under a negotiated grievance procedure are also covered by a statutory appeals procedure). These exceptions would make no sense unless Congress contemplated arbitration for a broader class of disputes than the statutory procedures covered. While the breadth of the definitions of "employee" and "grievance" in this chapter of the CSRA does not mean that agencies can *always* choose to give their workers arbitration rights over matters that Congress has

precluded them from challenging through the statutory procedures, see *Office of Chief Counsel,* 873 F.2d at 1471 n. 6, it does suggest that agencies can do so *unless* there are specific indications that such arbitration rights would frustrate congressional intent. Cf. *PBGC v. FLRA,* 967 F.2d 658, 665–66 (D.C.Cir.1992).

*Office of Chief Counsel* inferred a specific intent to bar people from going to arbitration over major "adverse actions" unless they have a matching statutory right to appeal to the MSPB instead. But one can draw no parallel inference for "prohibited personnel practices". To the contrary, the special indications upon which *Office of Chief Counsel* relied apply only to "adverse actions".

First and foremost, the court understood 5 U.S.C. § 7121(e)(2) to mean that when an employee who *could* appeal directly to the MSPB instead opts for arbitration, "the arbitrator is governed by MSPB precedent and may not interpret a collective bargaining agreement to reach results that would not be countenanced by the MSPB under its interpretation of the statute." *Office of Chief Counsel,* 873 F.2d at 1469.[2] According to the court, this "unusual and sophisticated device to ensure uniformity and MSPB primacy", *id.,* was a critical part of Congress's decision to let such employees go to arbitration over major adverse actions. But, since § 7121(e)(2) can secure uniformity only when arbitrators are confronted with employees who could have appealed directly to the MSPB, we inferred that Congress did not intend employees who lacked this option to be able to go to arbitration over major adverse actions. This reasoning, however, does nothing to block people from going to arbitration over *other* personnel actions. Because § 7121(e)(2) applies only to cases involving major adverse actions, an arbitrator confronted with Suzal's allegation of "prohibited personnel practices" would be no more or less bound by MSPB precedent than he would be in adjudging parallel allegations

---

**2.** Section 7121(e)(2) declares that in cases that could have been appealed directly to the MSPB under Chapters 43 or 75 of the CSRA, arbitrators are governed by 5 U.S.C. § 7701(c)(1). That section in turn sets out the MSPB's *standard of* *review,* telling the Board when to apply a "preponderance of the evidence" test and when to apply a "substantial evidence" test. See *United States Dep't of Health and Human Servs. v. FLRA,* 858 F.2d 1278, 1284 (7th Cir.1988).

brought by an employee who was covered by the CSRA.

The second aspect of the "uniformity problem" identified in *Office of Chief Counsel* is also restricted to major "adverse actions". As we observed, the CSRA generally permits arbitrators' decisions to be appealed only to the FLRA. *Id.* at 1470; see 5 U.S.C. § 7122(a). But in cases of major adverse actions that the aggrieved employee could have appealed directly to the MSPB, the arbitrator's decision is subject to the review provisions that would have applied to an MSPB decision. See *id.* § 7121(f). Generally, this means that the arbitrator's decision can be appealed only to the Federal Circuit, whose review is less deferential than the FLRA's would have been. See *id.* § 7703(b)(1). It would be odd, *Office of Chief Counsel* observed, if arbitrators' decisions in some cases were subject to review only in the Federal Circuit while their decisions in other cases—exactly parallel except that the aggrieved employee lacked MSPB appeal rights—were subject to review only in the FLRA. See *Office of Chief Counsel*, 873 F.2d at 1470–71. For the court, this was further evidence that Congress did not intend people who lacked MSPB appeal rights

to be able to go to arbitration over major adverse actions. But this concern again applies only to cases involving major adverse actions. Since arbitrators' decisions in cases of "prohibited personnel practices" can be appealed only to the FLRA, 5 U.S.C. § 7122(a), USIA's decision to give Suzal arbitration rights in such cases does not detract from any congressional device for assuring uniformity.[3]

■ If *Office of Chief Counsel* does not speak to our problem, we see no reason to hold that USIA acted *ultra vires* when it agreed to let Suzal go to arbitration over "prohibited personnel practices". The mere fact that Suzal was employed "without regard to the civil service . . . laws" does not preclude USIA from choosing to replicate the protections of those laws, any more than it precludes USIA from insisting that Suzal pass the competitive civil service exams applicable to other International Radio Broadcasters. See 5 U.S.C. § 3304. Congress's chief object in passing the Smith–Mundt Act was surely to give USIA added *discretion* that would let it employ qualified foreign-language broadcasters, not to place unusual constraints on the agreements that USIA could reach with those broadcasters.[4]

3. There might be some residual "uniformity problem", because it is not entirely clear that the FLRA would have jurisdiction to review Suzal's case. The labor-management relations chapter of the CSRA authorizes both the union and the agency to ask the FLRA to review the result of any arbitration "under this chapter". See 5 U.S.C. § 7122(a). But it is conceivable that arbitration in Suzal's case would not fit this description; if the labor-management relations chapter of the CSRA is considered a "civil service law", then USIA did not have to let Suzal join a union and be covered by any collective bargaining agreement. On the other hand, the negotiated grievance procedure that gave Suzal access to arbitration was established pursuant to 5 U.S.C. § 7121, and so arbitration conducted pursuant to that procedure might well be arbitration "under" the CSRA. We do not decide whether the FLRA could have considered Suzal's case, because even if it could not do so the resulting uniformity problem would be significantly different than the one that concerned the court in *Office of Chief Counsel.*

At least in the case of "prohibited personnel practices", moreover, Congress did not seem particularly concerned about ensuring uniformity of appellate review. When an employee who is covered by the CSRA opts to challenge "pro-

hibited personnel practices" through the statutory procedures, he files a complaint with the Office of Special Counsel; the Special Counsel can seek corrective action from the MSPB, and the MSPB's decision in such cases generally is subject to review in the Federal Circuit. See 5 U.S.C. §§ 1214(c), 7703(b). But when the same person opts to challenge the same practice through the negotiated grievance procedure, review of the arbitrator's decision lies with the FLRA. See *id.* § 7122(a).

4. Of course, the existence of this discretion does not necessarily mean that union proposals to extend arbitration rights to Smith–Mundt appointees would have been subject to mandatory bargaining under 5 U.S.C. §§ 7116(a)(5) or 7117. For one thing, Smith–Mundt appointees may not be covered by those provisions. See *supra* n. 3. In any event, there are different sorts of discretion: while an agency's discretionary authority over some aspect of employee relations often carries a duty to bargain over that aspect, see *Department of Treasury, U.S. Customs Serv. v. FLRA*, 873 F.2d 1473, 1476 (D.C.Cir.1989), that plainly is not true when Congress has indicated that the agency's discretion is not to be fettered by the pressures of mandatory bargaining. Cf. *supra* at 580.

3. *Suzal failed to exhaust his arbitration rights.*

■ Suzal suggests that he pursued the grievance procedure as far as the Voice of America would let him. See Appellant's Reply Brief at 4. Suzal and Hostetler did undertake the first step of the grievance procedure: informal discussion with a responsible Voice of America official. See CBA, Article XXIII, § 5(a)(1). So far as appears from the record, however, they never proceeded to the second step by filing a written grievance. See *id.* § 5(c)(1).

Suzal tries to justify his failure to take the next step by pointing to the Voice of America's resistance to his claim of arbitrability. During the informal discussions that took place at the beginning of 1991, Voice officials apparently told Suzal and Hostetler that Suzal lacked the right to challenge any final decision in his case either through arbitration or through the MSPB. See J.A. 86. Later, when Hostetler asked whether the Voice of America had decided not to accord Suzal these rights, the agency responded that the expiration and nonrenewal of a time-limited appointment was not subject to the negotiated grievance procedure. See J.A. 87.

But even if this response somehow excused Suzal from the need to file a written grievance, it cannot be read as a refusal to submit to arbitration on the threshold question of whether Suzal's nonrenewal was subject to arbitration. If arbitration had properly been invoked, the Voice of America's collective bargaining agreement plainly called for the agency to submit to it. See CBA, Article XXIII § 2(c) ("Questions that cannot be resolved by the parties as to whether a grievance is based on a matter subject to this procedure will be referred to an arbitrator for decision. If the threshold question of arbitrability is answered in the affirmative, the arbitrator will continue at the same hearing to consider the case on its merits."). The Voice of America gave no indication that it would not comply with this provision, and indeed it had complied with the provision in Suzal's own 1987 grievance. Nonetheless, Suzal never asked his union to invoke arbitration on his behalf, as contemplated by the collective bargaining agreement. See *id.* § 5(d).

There is no reason to think that the union would have refused such a request. In the 1987 grievance, when the Voice of America first attempted to let Suzal's appointment expire without renewal, the union had successfully invoked arbitration on Suzal's behalf. In August 1990, when the Voice of America rescinded Suzal's permission to write for *Sabah,* the union president himself accompanied Suzal to his first meeting with Voice of America officials. Suzal's union representative (and current counsel) seems to have worked diligently on his behalf, and her correspondence with Voice of America officials indicates that the union president would have readily invoked arbitration for Suzal. See J.A. 83, 86. Indeed, the union has filed an *amicus* brief on Suzal's behalf in this court, and Suzal has never suggested that his union showed any want of zeal.

## C. *Suzal failed to pursue arbitration.*

■ BUCKLEY, *Circuit Judge:* We noted, in Part II.B. above, that the collective bargaining agreement had conferred arbitration rights on Suzal and that the Voice of America had the authority to enter into such an agreement. We also concluded that both Suzal's reprisal and his First Amendment theories were grievable as "prohibited personnel practices," notwithstanding the Voice of America's contention that nonrenewal of Suzal's appointment was not subject to the negotiated grievance procedure of the CBA. The question remaining, then, is whether, in the face of this rebuff, Suzal was entitled to pursue his claims in court rather than invoking arbitration.

The CBA makes recourse to the negotiated grievance procedure mandatory:

> This procedure shall be the sole procedure available to the employees and the Union for resolving grievances within its scope. Questions that cannot be resolved by the parties as to whether a grievance is based on a matter subject to this procedure will be referred to an arbitrator for decision. If the threshold question of arbitrability is answered in the affirmative, the arbitrator

will continue at the same hearing to consider the case on its merits.

Article XXIII, § 2(c). The Supreme Court has made it plain that such a provision in a collective bargaining agreement may not be circumvented through an appeal to the courts. *See* the *Steelworkers Trilogy: United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

In those cases, the Supreme Court elevated the role of arbitration in labor disputes above its role in commercial disputes:

> Courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties; such resort is the unwanted exception. But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

*Warrior & Gulf*, 363 U.S. at 581, 80 S.Ct. at 1352. Moreover, the Court emphasized the special role of the labor arbitrator in resolving labor disputes, stressing that he "performs functions which are not normal to the courts." *Id.* Thus he will bring to bear his knowledge of industry practices and, "insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished." *Id.* at 582, 80 S.Ct. at 1353. Facing this strong policy favoring arbitration, the Court concluded that where the parties have agreed to resolve a labor dispute by arbitration, the judiciary merely "sits ... to bring into operation an arbitral process which substitutes a regime of peaceful settlement for the older regime of industrial conflict." *Id.* at 585, 80 S.Ct. at 1354.

This regime continues to receive the Court's approbation. As recently as 1986, the Court stated that the *Steelworkers Trilogy* principles had served the industrial relations community well, and it saw "no reason ... to question their continuing validity...." *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). In *AT & T*, the Court also confirmed that where the parties explicitly provide for the question of arbitrability to be decided in the first instance by the arbitrator, the courts should decline to address that question. *Id.* at 649, 106 S.Ct. at 1418 (question of arbitrability generally an issue for judicial determination "[u]nless the parties clearly and unmistakably provide otherwise...."); *see also Washington–Baltimore Newspaper Guild, Local 35 v. Washington Post*, 959 F.2d 288, 291 (D.C.Cir.1992) (enforcing provision of collective bargaining agreement requiring arbitration of the question of arbitrability).

Here, the CBA "clearly and unmistakably" provides that disputes over arbitrability will be submitted to the arbitrator. *See* Article XXIII, § 2(c) ("Questions that cannot be resolved by the parties as to whether a grievance is based on a matter subject to this procedure will be referred to an arbitrator for decision."). Therefore, when the Voice of America took the position that his nonrenewal could not be challenged through arbitration, it was incumbent on Suzal to ask the union to refer the dispute to arbitration. This he failed to do, and thus we will not hear his claims. *See Warrior & Gulf*, 363 U.S. at 585, 80 S.Ct. at 1354.

Our concurring colleague arrives at the same result by a different route. His analysis is straightforward and seductive. It goes as follows: By its own terms, the CBA was entered into "under authority ... of the Civil Service Reform Act of 1978." CBA, Article I. In turn, section 7121(a)(1) of the CSRA provides that "the procedures [for the settlement of grievances] shall be the exclusive

procedures for resolving grievances which fall within its coverage," 5 U.S.C. § 7121(a); because the CSRA governs the agreement, and because Suzal, in turn, is subject to its terms, arbitration is his exclusive remedy. Finally, because we have held, in *Steadman*, 918 F.2d at 966–68, that exhaustion of the nonjudicial remedies provided under the authority of the CSRA is a jurisdictional prerequisite, and because section 7121(a)(1) mandates exclusive recourse to the CBA's grievance-resolving procedures, Suzal's failure to have pursued arbitration deprives us of jurisdiction to hear this appeal. *See* Concurring Op. at pp. 586–88.

Our problem with this analysis is that it is predicated on the assumption that a Smith–Mundt employee, who cannot contract to obtain direct recourse to the protection afforded by the CSRA, may nevertheless be made subject to its restrictive terms by contract. To our mind, this defeats the purpose of the Smith–Mundt Act, which is to exclude such employees from coverage by our civil service laws. If Smith–Mundt employees are outside the scope of the CSRA, this implies not only that they do not benefit from its protection, but also that they do not labor under its restrictions.

### III. Conclusion

We conclude that Suzal was obliged by the collective bargaining agreement to submit his grievances to arbitration before seeking relief in the district court. Accordingly, the case is remanded to the district court with instructions to dismiss.

*So ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring:

I write separately in part II.C. of this opinion because I believe that Suzal's failure to exhaust his arbitration rights defeats the courts' jurisdiction.

1. *At least for employees who are covered by the civil service laws, exhaustion of available grievance rights is a jurisdictional prerequisite.*

Where exhaustion is not required by statute, we have held that whether to invoke the exhaustion doctrine *sua sponte* rests within the sound discretion of the trial court. See, e.g., *National Wildlife Fed'n v. Burford*, 835 F.2d 305, 317–18 (D.C.Cir.1987); *id.* at 330–32 (Williams, J., concurring and dissenting). But when a statutory scheme—whether explicitly or by clear implication—requires plaintiffs to exhaust their nonjudicial remedies before turning to the courts, the exhaustion requirement becomes less flexible. *McCarthy v. Madigan*, —— U.S. ——, ——, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992); *Patsy v. Board of Regents*, 457 U.S. 496, 502 n. 4, 102 S.Ct. 2557, 2560 n. 4, 73 L.Ed.2d 172 (1982). Statutes of this sort make exhaustion a jurisdictional prerequisite. See, e.g., *Brown v. General Servs. Admin.*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (interpreting 42 U.S.C. § 2000e–16).

One might think that this kind of exhaustion requirement would never apply to grievance rights conferred by a collective bargaining agreement rather than a statute. Even with respect to employees covered by the CSRA, after all, agencies are under no obligation to make any particular matters "grievable"; the scope of an employee's grievance rights is determined by contract. See 5 U.S.C. § 7121(a)(2). A decade ago, we did not even *discuss* whether the CSRA might make exhaustion of such rights a statutory requirement; faced with civil service employees seeking to challenge actions taken pursuant to a reduction in force, we analyzed the exhaustion issues purely on prudential grounds, stating simply that "the exhaustion requirement is not in general jurisdictional in nature". *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C.Cir.1984); cf. *National Fed'n of Federal Employees v. Weinberger*, 818 F.2d 935, 940–41 (D.C.Cir.1987).

But the intervening case of *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), affected our later analysis. Describing the CSRA as "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration", *Fausto* held that the statute implicitly repealed prior laws to the extent

that they conferred implied rights to judicial review of personnel actions. *Id.* at 445, 453, 108 S.Ct. at 672, 676. The Supreme Court reasoned that Congress's effort to erect an integrated and comprehensive system would have been thwarted if people could still proceed under the "haphazard arrangements for administrative and judicial review of personnel action" that had grown up before the CSRA. See *id.* at 444, 108 S.Ct. at 672; cf. *Smith v. Robinson,* 468 U.S. 992, 1010, 104 S.Ct. 3457, 3467, 82 L.Ed.2d 746 (1984).

*Fausto,* of course, read the CSRA not merely to defer judicial consideration of certain challenges to federal personnel actions but to keep them out of court entirely. Cf. *Carducci v. Regan,* 714 F.2d 171, 173–75 (D.C.Cir.1983); *Spagnola v. Mathis,* 859 F.2d 223, 230 n. 13 (D.C.Cir.1988) (en banc). But we have held that the district courts are open to challenges seeking equitable relief on *constitutional* grounds, at least when the CSRA does not provide an adequate alternative route to judicial review.[1] See, e.g., *id.* at 229–30; *Griffith v. FLRA,* 842 F.2d 487, 494–95 (D.C.Cir.1988); *Hubbard v. United States EPA Administrator,* 809 F.2d 1, 11 (D.C.Cir. 1986); *Carducci,* 714 F.2d at 175–77; *Borrell v. United States Int'l Communications Agency,* 682 F.2d 981, 989–90 (D.C.Cir.1982); cf. *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988) (stating presumption against interpreting statutes to preclude judicial review of constitutional challenges). Still, the principle that we should construe statutes to allow people with constitutional claims to come to court *eventually* hardly requires constructions allowing them to bypass the available nonjudicial remedies entirely.

To the contrary, in *Steadman v. Governor, U.S. Soldiers' & Airmen's Home,* 918 F.2d 963 (D.C.Cir.1990), we interpreted the CSRA as imposing an implicit exhaustion requirement: except in "the unusual case in which the constitutional claim raises issues totally unrelated to the CSRA procedures",[2] district courts cannot take jurisdiction until *after* plaintiffs have exhausted the nonjudicial structure contemplated by Congress. *Steadman,* 918 F.2d at 966–68. *Steadman* cited some pre-CSRA cases emphasizing the prudential argument that requiring exhaustion in such circumstances might "eliminat[e] any need for the courts to pass on the constitutional issues". See *Wallace v. Lynn,* 507 F.2d 1186, 1190–91 (D.C.Cir.1974); see also *Aircraft & Diesel Equip. Corp. v. Hirsch,* 331 U.S. 752, 774, 67 S.Ct. 1493, 1504, 91 L.Ed. 1796 (1947). But we relied principally on the rationale of *Fausto*: the same logic underlying the Supreme Court's view that the CSRA "precludes district courts from taking jurisdiction over [nonconstitutional] CSRA-related claims" necessarily bars federal employees from sidestepping Congress's scheme "even if their claim is based as well on the Constitution". *Steadman,* 918 F.2d at 967. Congress, we reasoned, did not intend to let plaintiffs sidestep its careful remedial structure whenever they were able to cast their complaints in constitutional terms. *Id.* (citing *Brown v. GSA,* 425 U.S. at 833, 96 S.Ct. at 1968).

*Steadman* emphasized, moreover, that the authorization of collective bargaining is part of Congress's "enormously complicated and subtle scheme to govern employee relations in the federal sector", and that the grievance rights resulting from that authorization are woven into the overall scheme. *Id.* These rights, then, are part of the remedial structure that Congress intended to prevent federal employees from circumventing.

In *Steadman* itself, the plaintiff employees had failed to exhaust the grievance rights

---

1. Other circuits have found the statutory procedures exclusive even when they provide for little or no judicial review. See *Saul v. United States,* 928 F.2d 829, 843 & n. 27 (9th Cir.1991); *Lombardi v. Small Business Admin.,* 889 F.2d 959, 961–62 (10th Cir.1989); *Pinar v. Dole,* 747 F.2d 899, 909–12 (4th Cir.1984).

2. If the constitutional claim can be pursued and fully remedied through the CSRA procedures, it does not fit this exception. And even if the claim cannot be pursued through those procedures, it is not "totally unrelated" to them if it (1) is premised on the same facts as claims that could be pursued through those procedures, and (2) could potentially be mooted by the relief available on those claims. *Id.* at 963, 967; accord *National Treasury Employees Union v. King,* 961 F.2d 240, 243 (D.C.Cir.1992). Cf. *Andrade,* 729 F.2d at 1493.

that their employing agency had purported to extend to them through their collective bargaining agreement, but we did not rely on this failure because we thought that the agency might have been acting *ultra vires* when it gave these particular employees such grievance rights. See *id.* at 966 n. 4. Nonetheless, we found that the employees had failed to exhaust other channels of relief available through the Federal Labor Relations Authority. Accordingly, we remanded the case to the district court "with instructions to dismiss for lack of subject matter jurisdiction". *Id.* at 968.

2. *Even though Suzal was employed without regard to the civil-service laws, he still faced a statutory exhaustion requirement.*

*Steadman's* conclusion—that the CSRA *implicitly* imposes a broad bar on efforts to circumvent the nonjudicial remedies contemplated by Congress—is not directly applicable to Suzal, who was employed "without regard to" the CSRA. But Suzal still faced a statutory exhaustion requirement, because of a narrower bar that Congress *explicitly* made applicable to the collective bargaining agreement under which Suzal enjoyed his grievance rights.

Suzal's union, Local 1812 of the American Federation of Government Employees, is the exclusive representative of a bargaining unit that includes many ordinary employees (fully covered by the CSRA) as well as some Smith–Mundt employees. The contract that the union reached with USIA in its capacity as the representative of this unit plainly qualifies as a "collective bargaining agreement" within the meaning of the CSRA's chapter on

labor-management relations. See 5 U.S.C. § 7103(a)(8), (12). Suzal's grievance rights stem from this same agreement. And the CSRA provides that the grievance procedures established in "any collective bargaining agreement" are "the *exclusive* procedures for resolving grievances which fall within [the agreement's] coverage", except to the extent of their overlap with the statutory appeals procedures set out in the CSRA. 5 U.S.C. § 7121(a)(1) (emphasis added).

The Supreme Court has applied a strong presumption against reading statutes to preclude all judicial review of constitutional claims, see *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053, 100 L.Ed.2d 632 (1988), but at a minimum § 7121(a)(1) must impose an exhaustion requirement: Congress plainly did not want employees to take their grievances straight to court when they could have pursued the negotiated procedure instead.[3] In § 7121(a)(1), then, Congress expressed its intention to prevent circumvention of available grievance rights far more clearly than it expressed the broader intention (which *Steadman* inferred merely from the comprehensiveness of the overall statutory scheme) to prevent circumvention of the other nonjudicial remedies that the CSRA contemplated.

The Smith–Mundt Act, moreover, does not mean that § 7121(a)(1) has no consequences for Suzal. While he personally was employed without *regard* to the CSRA, the CSRA certainly applies to the collective bargaining agreement through which USIA chose to give him his grievance rights. Of course, USIA was not *obliged* to use a collective bargaining agreement covered by the CSRA as the vehicle for extending grievance rights to Suzal. But it elected to do so.[4]

**3.** The principle of *Webster v. Doe* cannot be applied when Congress clearly intended to preclude judicial review altogether, and if we were to read § 7121(a)(1) as reflecting such a clear intent we would have to confront the "serious constitutional question" of whether it is valid as applied to constitutional claims. See *id.* But even if we held § 7121(a)(1) invalid insofar as it keeps constitutional claims out of court *altogether,* Suzal would not benefit, for the provision still would operate as an exhaustion requirement. See *Aircraft & Diesel Equip. Corp.,* 331 U.S. at 767, 67 S.Ct. at 1501 ("When Congress has clearly commanded that administrative judgment be taken initially or exclusively, the courts have no lawful

function to anticipate the administrative decision with their own, whether or not when it has been rendered they may intervene either in presumed accordance with Congress' will or because, for constitutional reasons, its will to exclude them has been exerted in an invalid manner.").

**4.** We need not decide whether USIA's use of a different vehicle (such as an individual contract) might have freed Suzal from any statutory exhaustion requirements. This question would call upon us to determine the implicit statutory limits, if any, on the generosity of the grievance rights that USIA is empowered to give Smith–

**588**

Since Suzal is raising grievances covered by the procedures erected in the collective bargaining agreement between USIA and Local 1812, and since Congress explicitly made those procedures the *exclusive* means for resolving covered grievances, Suzal cannot take his complaints straight to court.

### 3. No exception to the statutory exhaustion requirement applies here.

To the extent that § 7121(a)(1) merely imposes an exhaustion requirement rather than a true exclusivity requirement, *Steadman* suggests that it might incorporate an exception for constitutional claims "totally unrelated" to the grievance procedures contemplated by Congress. See *supra* at 586 n. 2. But in contrast to *Andrade*, where the constitutional claim was based on the Appointments Clause and could not have been pursued through arbitration, Suzal's First Amendment claim made out a "prohibited personnel practice" that he could have challenged in the grievance procedure. See Maj. Op. at 579–80. Indeed, much of the relief Suzal sought in court was an order granting him access to arbitration. See Suzal's Reply Brief at 3 ("Suzal made clear from the outset of his case that he sought a District Court order requiring VOA to afford him an opportunity to pursue the agency's greivance/arbitration procedures."); Suzal's Supplemental Brief at 14 ("[T]he essence of the remedy sought can still be given ... by requiring the agency to cease refusing to arbitrate on the basis of its view that the 1948 statute precludes arbitration...."). Suzal's grievance route, then, apparently had the potential to redress fully his alleged constitutional violations. Cf. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965) ("[F]ederal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress.... [I]t cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted

Mundt employees. Cf. *Steadman*, 918 F.2d at

to implement the procedures and found them so.").

Accordingly, I would vacate the district court's orders and remand with instructions to dismiss the case for want of subject-matter jurisdiction.