87 F.3d 1429
 318 U.S.App.D.C. 420, 65 USLW 2056,
11 IER Cases 1581
 Carolyn WEAVER, Appellant,
v.
UNITED STATES INFORMATION AGENCY, Joseph Duffey, Director,
USIA, The Voice of America, Richard Carlson, Director, VOA,
United States Department of State, Warren Christopher,
Secretary of State, Appellees.
 No. 94-5406.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 31, 1995.
Decided July 9, 1996.
 
 Stephen M. Kohn, Washington, DC, argued the cause and filed the briefs, for appellant.
 Elaine D. Kaplan, Washington, DC, argued the cause, for amicus curiae National Treasury Employees Union. With her on the brief were Gregory O'Duden and Barbara A. Atkin, Washington, DC.
 R. Craig Lawrence, Assistant United States Attorney, argued the cause, for appellees. With him on the brief were Eric H. Holder, Jr., United States Attorney, and Carol B. Epstein, Assistant General Counsel, United States Information Agency.
 Before: WALD, SILBERMAN and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 Dissenting opinion filed by Circuit Judge WALD.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Employees of the State Department, the United States Information Agency ("USIA"), and the Agency for International Development ("AID") are required to submit all speaking, writing, and teaching material on matters of "official concern" to their employers for review prior to publication. 3 Foreign Affairs Manual ("FAM") § 628.2. Material of "official concern" is broadly defined to include any material related to the employee's agency or U.S. foreign policy, as well as any material that "reasonably may be [318 U.S.App.D.C. 423] expected to affect the foreign relations of the United States." Id. Appellant Carolyn Weaver, a part-time employee of the Voice of America ("VOA"), a unit of USIA, published an article in the Columbia Journalism Review in 1988 without submitting it for prepublication review. The article, "When the Voice of America ignores its charter--An insider reports on a pattern of abuses," attacked VOA over a range of issues, from allegations that it communicated "coded signals" to Solidarity activists (by playing a song from a Rod Stewart album) to more conventional assertions of politicization. She and USIA agree that the article contained material of "official concern." An agency official read her an oral admonishment for her failure to honor the prepublication review requirement.
 
 
 2
 Even before receiving the admonishment, Weaver filed suit challenging the review procedure on First Amendment grounds and seeking declaratory and injunctive relief. That claim remains as Count I of her amended (post-admonishment) complaint. Count II attacks the oral admonishment. Count III in part repeats Count II's demand for relief from the oral admonishment, and, together with Count IV, seeks documents and fee waivers under the Freedom of Information Act. Weaver evidently secured at least some of her FOIA objectives and does not here pursue any unfulfilled ones. The district court granted the government's motion for summary judgment on Weaver's remaining claims, finding that the review requirement did not impermissibly infringe her free speech rights. Weaver v. Wick, No. 88-1790 (D.D.C. Nov. 18, 1994).
 
 
 3
 The threshold issue on appeal is whether Weaver's failure to exhaust her administrative remedies for the oral admonishment deprives the court of jurisdiction. We find that it does as to Counts II and III of the complaint, and thus we affirm the dismissal of those counts without reaching their merits. Count I, however, stands independently of the oral admonishment as a general First Amendment challenge to the prepublication review scheme, and therefore it raises no exhaustion problem. On the merits of Count I, we find that the review requirement, which we interpret narrowly to avoid constitutional difficulties, does not violate the First Amendment.
 
 I. Exhaustion Requirement
 
 4
 A. Availability of Administrative Remedies.
 
 
 5
 Non-judicial remedies for adverse personnel decisions by government employers stem from two sources: the Civil Service Reform Act ("CSRA") of 1978, Pub.L. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), and provisions of collective bargaining agreements affording grievance rights to covered employees (the latter strongly bolstered by the CSRA itself). See Suzal v. Director, USIA, 32 F.3d 574, 578-82 (D.C.Cir.1994). In this case only the CSRA's direct remedies are relevant; the collective bargaining agreement covering Weaver and other members of the bargaining unit of Local 1812 of the American Federation of Government Employees expressly exempts "admonishments" from the category of personnel actions giving rise to grievance rights. Negotiated Labor-Management Agreement Between United States Information Agency and American Federation of Government Employees, Local 1812, Art. XXIII, § 2(b).
 
 
 6
 The CSRA provides remedies for any "prohibited personnel practice." Such practices include "tak[ing] or fail[ing] to take any ... personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 [of title 5]." 5 U.S.C. §§ 2302(a)(1) & (b)(11). Among the merit system principles in § 2301 is the requirement that all employees be treated "with proper regard for their privacy and constitutional rights." Id. § 2301(b)(2). So it is a "prohibited personnel practice" to take a personnel action that unconstitutionally burdens an employee's speech. Suzal, 32 F.3d at 580; Spagnola v. Mathis, 859 F.2d 223, 225 & n. 3 (D.C.Cir.1988).
 
 
 7
 It also appears that an admonishment is a "personnel action" (and thus the sort of act that can qualify as a "prohibited personnel practice") as the term has been interpreted [318 U.S.App.D.C. 424] by the Merit Systems Protection Board ("MSPB"), the administrative body charged with implementing the CSRA. The statute defines "personnel action" to include "an action under chapter 75 of this title [governing dismissals, suspensions, grade or pay reductions, and furloughs] or other disciplinary or corrective action." 5 U.S.C. § 2302(a)(2)(iii) (emphasis added). The MSPB at one time applied the principle of ejusdem generis to read "other disciplinary or corrective action" as limited to acts "in the nature of a Chapter 75 action," i.e., acts of a similar type and seriousness. Caddell v. Dep't of Justice, 52 M.S.P.R. 529, 532-33 (1992). Now, however, it views admonishments as "personnel actions" and apparently does not distinguish between oral and written ones. Cochran v. Dep't of Veterans, 67 M.S.P.R. 167, 174 (1995) (letter of admonishment); Gonzales v. Dep't of Hous. & Urban Dev., 64 M.S.P.R. 314, 319 (1994) ("an official reprimand"). The MSPB's interpretation is entitled to deference. Lovshin v. Dep't of the Navy, 767 F.2d 826, 840 (Fed.Cir.1985). Thus, if the review requirement giving rise to Weaver's oral admonishment is unconstitutional, as she says, then the admonishment is a "prohibited personnel practice."
 
 
 8
 Because the oral admonishment is not one of the relatively drastic personnel actions that entitle the affected employee to appeal to the MSPB, compare 5 U.S.C. §§ 4303(e), 7513(d) (permitting appeal in the case of dismissal and other serious actions), Weaver's remedy under the CSRA consists of the right to file a complaint with the Office of Special Counsel ("OSC"). Id. § 1214(a)(1)(A). If the OSC finds "reasonable grounds" to believe that a prohibited personnel practice has occurred, it must report its determination to the agency involved and the MSPB. Id. § 1214(b)(2)(B). If the agency fails to correct the practice within a reasonable period of time, then OSC may--but need not--seek corrective action by the MSPB. Id. § 1214(b)(2)(C). The OSC is required to act on allegations of prohibited personnel practices within 240 days, with an exception for situations in which the person making the allegation agrees to an extension of time. Id. § 1214(b)(2)(A).
 
 
 9
 Although the CSRA gives the OSC discretion whether to seek corrective action, our circuit's law affords employees in Weaver's position a right to federal court review of their constitutional claims at the end of the line. See, e.g., Spagnola, 859 F.2d at 229-30; Griffith v. FLRA, 842 F.2d 487, 494-95 (D.C.Cir.1988); cf. Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 2053-54, 100 L.Ed.2d 632 (1988) (general presumption of reviewability for constitutional challenges). But cf. Saul v. United States, 928 F.2d 829, 843 & n. 27 (9th Cir.1991) (holding unreviewable a constitutional claim intertwined with a CSRA claim, and noting the departure of this circuit from other circuits' rulings on the issue); Pinar v. Dole, 747 F.2d 899, 909-12 (4th Cir.1984) (similar). But first the plaintiff must exhaust available administrative remedies. Steadman v. Governor, United States Soldiers' & Airmen's Home, 918 F.2d 963, 967 (D.C.Cir.1990). Weaver, in declining to challenge her oral admonishment with the OSC, indisputably failed to satisfy this requirement. The question is the effect of that failure as to each of the counts in her complaint.
 
 
 10
 B. Failure To Exhaust.
 
 
 11
 Under the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit. Id. at 966-68; cf. United States v. Fausto, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (holding that the CSRA, in failing to provide explicitly for administrative or judicial remedies for certain decisions affecting nonpreference excepted service employees, implicitly bars judicial remedies). The exhaustion requirement clearly applies to Weaver's claim for relief from the oral admonishment (which as we have seen is remediable under the CSRA), and thus Counts II and III of her complaint must be dismissed for want of jurisdiction. The exhaustion requirement generally applies as well to claims arising directly under the Constitution (such as Weaver's claim for declaratory and injunctive relief from the prepublication review requirement) when such claims are " 'premised on the same facts' " as the plaintiff's CSRA claims and "the CSRA remedy 'would have been fully effective in remedying the constitutional [318 U.S.App.D.C. 425] violation.' " Steadman, 918 F.2d at 967 (quoting Andrade v. Lauer, 729 F.2d 1475, 1493 (D.C.Cir.1984)). Here, Weaver's constitutional claim is intertwined with her CSRA claim in the most absolute manner imaginable: it is its sole basis.
 
 
 12
 But Weaver disputes the effectiveness of the CSRA remedy, saying that only a court can provide an injunction against enforcement of the prepublication review requirement. In requiring that the CSRA remedy be effective, however, we do not think Steadman and Andrade intended so high a standard, for under that standard the CSRA remedy would be inadequate whenever the plaintiff sought injunctive relief. Further, Weaver's view that the inability to grant injunctive relief is material assumes that the government would continue to enforce the review requirement even after an unreversed administrative finding that the requirement was unconstitutional.[1] Weaver also points to the uncertainties in the CSRA remedy--the possible delays and the dependence on a favorable exercise by the OSC of its discretion whether to take the case to the MSPB. But the delays seem no more than the normal concomitant of an exhaustion requirement--perhaps less, in view of the statute's deadline for OSC action. Although the OSC discretion adds an element of uncertainty that is distinct from the ordinary vicissitudes of agency proceedings, Congress evidently thought it adequate in view of the relatively minor character of the wrongs whose redress it left to OSC discretion, perhaps fearing that a universal right of appeal to the MSPB would cause trivial claims to delay and crowd out more serious ones. In any event, in this circuit there is, as we have seen, the opportunity for judicial relief at the end of the tunnel.
 
 
 13
 Although Weaver has not established that the CSRA remedy would be ineffective, she is nevertheless entitled to pursue her non-CSRA claim for declaratory and injunctive relief without having exhausted her administrative remedies for the oral admonishment. This is so because, in contrast to the situation contemplated in Steadman, the count of her complaint seeking declaratory and injunctive relief stands independently of the admonishment; indeed it is virtually identical to the original complaint she filed before the oral admonishment had occurred. Thus, if we simply affirmed the dismissal of the amended complaint on exhaustion grounds, Weaver would be free to--and almost certainly would--promptly refile her complaint shorn of references to her refusal to observe the review requirement and the resulting admonishment. As in United States v. Nat'l Treasury Employees Union, --- U.S. ----, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("NTEU"), and Sanjour v. EPA, 56 F.3d 85 (D.C.Cir.1995) (en banc), the district court would have jurisdiction over such a suit, framed as a simple pre-enforcement attack on a regulation restricting employee speech. This feature of Weaver's challenge distinguishes it from the ordinary case of a failure to exhaust CSRA remedies, in which the employee would have no claim that she could file directly in federal court if isolated from her claims for relief from a personnel action against her. We see no reason for disabling Weaver from pursuing in federal court a constitutional claim that under First Amendment principles is as final, ripe and free from exhaustion difficulties as it need be, and that she has standing to pursue, merely because she has also experienced a personnel action related to that claim.[2] Accordingly, we affirm [318 U.S.App.D.C. 426] the dismissal of Counts II and III of the complaint on exhaustion grounds and proceed to the merits of Count I.
 
 
 14
 II. Constitutionality of the Review Requirement
 
 
 15
 A. The Meaning of the Regulation.
 
 
 16
 The central provision of the prepublication review scheme is § 628.2:
 
 
 17
 a.... All speaking, writing, and teaching materials which may reasonably be interpreted as relating to the current responsibilities, programs, or operations of any employee's agency or to current U.S. foreign policies, or which reasonably may be expected to affect the foreign relations of the United States are of official concern and shall be submitted ... for clearance by the employee's agency, whether the employee is acting officially or privately.
 
 
 18
 b. No employee shall publish any material of official concern under paragraph a until it has been cleared. The purpose of this clearance requirement is to substitute the agency's institutional judgment for the employee's judgment when the question involved concerns either the release or accuracy of information concerning the employee's agency's responsibilities or what conclusions should be drawn from such information....
 
 
 19
 c. Clearance will not be granted until all classified material and all material of official concern under paragraph a which is inaccurate, inconsistent with current foreign policy, or can reasonably be expected to affect adversely U.S. foreign relations, has been deleted from the proposed speaking, writing, or teaching material....
 
 
 20
 3 FAM § 628.2 (contained in 3 FAM Appendix A to Subchapter 4100).[3]
 
 
 21
 The meaning of this provision is, as we shall see, not entirely clear. It contains two direct commands; first, paragraph "a" provides that material of official concern "shall be submitted ... for clearance by the employee's agency," and second, paragraph "b" specifies that "[n]o employee shall publish any material of official concern ... until it has been cleared." Thus, § 628.2 plainly requires (at a minimum) that employees undergo a clearance process, during which the agency reviews and passes upon material of official concern, before they publish such material. Weaver violated this requirement by refusing to submit her material for prepublication review.
 
 
 22
 The government argues that the regulation goes no further; once employees have undergone review to alert the agency to any problems in their material, § 628.2 has done its work. The regulation does not, the government says, authorize any form of punishment for publication of material disapproved by the agency, so long as it was submitted for review beforehand. Thus, on the government's view, the paragraph "b" requirement that no employee publish material of official concern "until it has been cleared" is a requirement that no employee publish such material until completion of the review process. The government fails to explain how paragraph "c", specifying conditions under which "clearance will not be granted," fits [318 U.S.App.D.C. 427] with its procedural interpretation of the regulation, but the two provisions can be reconciled by viewing paragraph "c" as establishing an implied safe harbor for publication of material approved by the agency under the listed criteria. Any authority the agency has to punish (or seek to enjoin) publication of disapproved material must then stem from some other source, such as the statutory prohibition on disclosure of classified information. See 18 U.S.C. § 798, infra note 5.
 
 
 23
 If, contrary to the government's proposed interpretation, the regulation were read to authorize punishment for publication of material disapproved under the criteria of paragraph "c"--inaccuracy, inconsistency with current foreign policy, or significant potential to affect U.S. foreign relations in an adverse manner--then the regulation would raise serious constitutional issues. For example, it is doubtful that the agency could, consistent with Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), penalize publications devoid of non-public information, by employees with non-sensitive responsibilities (e.g., a driver, a payroll accountant), writing in a context where their statements could not possibly be viewed as representing the agency or the United States, simply because the publication took a view "inconsistent with current foreign policy." Of course the hypothetical seems unlikely to represent a material share of enforcement activity under the regulation, and perhaps the breadth of § 628.2 might be found "reasonably necessary to protect" various government interests. NTEU, --- U.S. at ----, 115 S.Ct. at 1017. But even then insistence on advance approval would raise a further question, as before-the-fact condemnation of speech raises special concerns such as undue delay--the review itself plus time needed for a speaker to secure judicial relief--and stifling of expression that in hindsight would have been viewed as harmless or not worth the enforcement effort. See Freedman v. Maryland, 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965) (noting deterrent effect of delay); Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246-47, 43 L.Ed.2d 448 (1975) (arguing that a requirement of advance approval may shift the de facto border of the permissible).
 
 
 24
 These possibilities of constitutional infirmity suggest that we should adopt the government's interpretation if we find it to be consistent with the language of § 628.2. "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 659, 60 L.Ed. 1061 (1916); see also Rust v. Sullivan, 500 U.S. 173, 191, 111 S.Ct. 1759, 1771, 114 L.Ed.2d 233 (1991) (recognizing the applicability of the canon to regulations as well as statutes). This rule is subject, of course, to the proviso that the interpretation adopted must be a plausible one. Rust, 500 U.S. at 191, 111 S.Ct. at 1771.
 
 
 25
 While § 628.2 has unambiguous requirements related to the review process (material "shall be submitted" for clearance), it lacks such requirements concerning the publication of unapproved material (e.g., "no employee is permitted to publish any material disapproved by the agency"). Further, as a source of substantive criteria § 628.2 is at best obscure, at worst internally contradictory. While the "purpose" clause of paragraph "b" hones in on the accuracy of information about the employing agency's "responsibilities," paragraph "c" is addressed to consistency with current foreign policy and effect on U.S. foreign relations. If one tried to reconcile the two by reading "responsibilities" in paragraph "b" as some sort of shorthand for the policy issues highlighted in paragraph "c," one would encounter paragraph "a," which refers to both, presumably on the premise that they are different from each other.
 
 
 26
 To be sure, the government's interpretation of the regulation also has significant drawbacks. To begin, it requires that the term "cleared" in § 628.2b be given a different meaning from the term "clearance" in § 628.2c. While "cleared" in § 628.2b means "been through the review process" according to the government, "clearance" in § 628.2c cannot mean only that. For paragraph "c" specifies that "clearance will not be granted" until certain substantive conditions are met, [318 U.S.App.D.C. 428] and the only possible meaning of "clearance" in that context is "agency approval."
 
 
 27
 Normally, the same word in different portions of a single provision or act is taken to have the same meaning in each appearance. Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 608-09, 76 L.Ed. 1204 (1932). Like all rules of statutory construction, however, this one is defeasible. Identical words may have different meanings where "the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another." Id. In Atlantic Cleaners the Court held that the phrase "trade or commerce" had a different meaning in § 1 of the Sherman Act than in § 3 because of the difference between Congress's power to regulate interstate commerce (the basis for § 1) and its plenary power to legislate for the District of Columbia (the basis for § 3). Likewise, in Dewsnup v. Timm, 502 U.S. 410, 417-20, 112 S.Ct. 773, 778-80, 116 L.Ed.2d 903 (1992), the Court gave the term "allowed secured claim" a different meaning in two subsections of the same bankruptcy provision, based on a difference in context and a reluctance to infer that Congress had altered a settled rule of pre-Code bankruptcy law. In the case of § 628.2, the uncertainty over the government's constitutional power to authorize punishment for publication of material disapproved by the agency, together with the obscurities produced by interpreting the regulation to authorize such punishment, provide a basis for adopting differing interpretations of "cleared" and "clearance" in §§ 628.2b and 628.2c.
 
 
 28
 A further difficulty with the government's interpretation is the tension between the proposed reading of "cleared" in paragraph "b" and the statement of purpose immediately following the term. A mere requirement to submit to a review process seems to fall considerably short of "substituting the agency's institutional judgment for the employee's" on the matters specified in paragraph "b". The review process does, however, assure that the agency's judgment can be expressed to the employee. Even if the employee disregards the judgment, she is at least fully on notice. There are, in addition, collateral advantages explored more fully in the constitutional evaluation of § 628.2 as a purely procedural constraint. See pp. 432-433 below.
 
 
 29
 On the positive side, the procedural view of § 628.2 seems the most practical of the possible readings. We have no indication that the review process is in fact a lengthy one, and where review is constrained by publication or engagement deadlines, it seems improbable that the agency would want to place employees in breach of agency rules for publication of material that is, on close study, completely free of statements actually jeopardizing legitimate government interests. So far as appears, an agency may constitutionally discipline employees within the constraints of Pickering without any advance statement of criteria, on the basis of its general authority to punish behavior that disrupts its functions. Cf. Waters v. Churchill, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (public hospital employee discharged for performance deemed unsatisfactory because of statements made). Thus the government's interpretation does not on its face disable it from penalizing employees for any speech that substantively exceeds what is protected under Pickering.
 
 
 30
 Above all, the procedural interpretation is what the government itself has put forward in this litigation--and what it must adhere to in the future, at least unless it clearly announces an alternative reading. See General Electric Co. v. EPA, 53 F.3d 1324, 1329 (D.C.Cir.1995) (due process requires that an agency give parties "fair notice" of its regulatory interpretations before depriving them of property pursuant to those interpretations); cf. Kale v. Obuchowski, 985 F.2d 360, 361-62 (7th Cir.1993) (describing and applying doctrine of judicial estoppel, according to which a party who prevails in earlier litigation by asserting some proposition may not seek to prevail in a later case by asserting its opposite). But cf. United Mine Workers of Am. 1974 Pension v. Pittston Co., 984 F.2d 469, 477 (D.C.Cir.1993) (noting that this circuit has "not previously embraced" judicial estoppel). [318 U.S.App.D.C. 429] Weaver has brought a suit complaining of First Amendment burdens that the government claims simply don't exist. If the government is willing to disclaim any non-procedural force in § 628.2, we see no reason to insist that it has such force.
 
 
 31
 It is true that the government's procedural interpretation of the regulation was advanced only in this litigation, and that VOA had in fact adopted an alternative interpretation in an internal directive. See VOA Directive D-1731A at 6 (Nov. 24, 1986) (stating that employees must obtain "specific advance approval" before publishing material of official concern and that "[a]pproval will not be granted" unless the criteria in § 628.2c are satisfied) (emphasis added). However, neither of the two reasons we have previously identified for cautious treatment of agency positions advanced by counsel in litigation applies here. See FLRA v. Dep't of Treasury, 884 F.2d 1446, 1455-56 (D.C.Cir.1989).
 
 
 32
 First, there is no significant concern that judicial reliance on the interpretation of counsel (the United States Attorney) will have a significant lock-in effect on the relevant agencies, sticking them with an interpretation that they had not themselves espoused. See id. at 1455. Any of these agencies--the State Department, USIA, and AID--could easily promulgate an interpretation of § 628.2 different from that offered by counsel (or indeed could promulgate a different rule altogether). Because the regulation governs agency personnel, the controlling agencies may amend or alter their interpretations of it without advance notice and comment rulemaking procedures. See 5 U.S.C. § 553(a)(2). We note, however, that, until such an express interpretation or amendment occurs, the interpretation proposed by counsel will be binding on all of the defendants here--the State Department and USIA as well as VOA. Compare Dissent at 439 n.8.
 
 
 33
 The second reason for hesitance about positions advanced in litigation--that they may reflect a short-circuiting of statutory decision processes or may contradict authoritative agency interpretation or practice, see id. at 1455-56; see also Church of Scientology of Cal. v. IRS, 792 F.2d 153, 165 (D.C.Cir.1986) (en banc) (Silberman, J., concurring)--also does not apply. The VOA Directive--which clearly does not bind USIA apart from its VOA division and thus cannot be said to represent an "agency" view--is not such an authoritative interpretation, and there is no hint in the record that one exists.
 
 
 34
 So far as the application of § 628.2 is concerned, the record is almost completely barren. According to a 1988 affidavit from the acting director of the staff of VOA's Office of External Affairs, which administers § 628 for the VOA, there was at that time no instance in the institutional memory of the office (stretching back about five years) in which a VOA employee had refused to make changes requested by the agency. Affidavit of Robert T. Coonrod at 2 (July 8, 1988). Of course, that may only show the regulation's in terrorem effects--employees may have made changes out of fear of punishment--but it is also fully consistent with agency counsel's proposed interpretation.
 
 
 35
 The record does reveal one application of § 628.2, and that instance is in complete conformity with the government's view of the regulation. Although exhaustion requirements prevent our adjudication of Weaver's oral admonishment claim, the admonishment is available as evidence of the agency's behavior under the regulation. The admonishment--of which she was given a written copy--chastises her only for having published her article "without proper clearance procedures" (emphasis added), referring to § 628.2b. It makes no mention of substantive violations, though it seems highly improbable that the agency regards Weaver's analysis of the playing of Rod Stewart songs, etc., as satisfying all the criteria in § 628.2 that seem to speak to substance--accuracy (in both raw facts and conclusions), and conformity with the VOA's responsibilities and current U.S. foreign policy.
 
 
 36
 Accordingly, in light of the constitutional difficulties entailed by reading § 628.2 more broadly than suggested by the government, we adopt its interpretation. We are, quite simply, reluctant to find burdens on speech that the government eschews any intention to impose. Our dissenting colleague would find such burdens (and appears to view our [318 U.S.App.D.C. 430] adherence to an interpretation limiting the impact on employees as somehow "fundamentally unfair" to employees), apparently because the regulation as written "chill[s] free speech from employees who have in the past and may in the future reasonably believe [it] requires them to make changes in their manuscripts to gain 'clearance.' " Dissent at 439 (emphasis in original). We have two responses to this view. First, to the extent it addresses employees who do not learn of judicial decisions involving their First Amendment rights (and thus may perceive § 628.2 to require more than submission to the prepublication review process), the problem would exist even if we found § 628.2 unconstitutional. For even when a regulation is found invalid, the government is not required (so far as we know) to issue a formal retraction of the objectionable provision or a new, cleansed edition of its regulations. Cf. Exec. Order No. 12,836, 58 Fed.Reg. 7045 (1993) (revoking requirement that unionized contractors on federal projects post notices informing workers of their First Amendment rights under Communications Workers of Am. v. Beck, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988)).
 
 
 37
 Second, the canon favoring construction to avoid constitutional difficulties will generally run the risk that there will be inadequately informed subjects of the regulation, for the interpretation adopted will be generally other than the most obvious one--indeed, may be quite non-obvious. See, e.g., Public Citizen v. U.S. Department of Justice, 491 U.S. 440, 455, 462-63, 466, 109 S.Ct. 2558, 2567, 2570-71, 2572-73, 105 L.Ed.2d 377 (1989) (rejecting "plain-meaning" rule to avoid constitutional difficulties). Yet the Supreme Court has applied the canon in the First Amendment context--indeed, in cases involving employees' First Amendment rights. See International Ass'n of Machinists v. Street, 367 U.S. 740, 749-50, 81 S.Ct. 1784, 1789-90, 6 L.Ed.2d 1141 (1961). Our application of the constitutional avoidance canon to § 628.2 is unexceptional. Having adopted the government's proposed interpretation of the regulation, we now proceed to the merits of the First Amendment claim.
 
 
 38
 B. First Amendment Analysis.
 
 
 39
 Restraints on the speech of government employees on "matters of public concern" are governed by a balancing test; they are permissible where the government interest in " 'promoting the efficiency of the public services it performs through its employees' " outweighs the interests of prospective speakers and their audiences in free dissemination of the speakers' views. NTEU, --- U.S. at ---- - ----, 115 S.Ct. at 1012-14 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1735). Where a restraint is accomplished through a generally applicable statute or regulation, as opposed to a particularized disciplinary action, we must also make sure that the regulation's sweep is "reasonably necessary to protect the efficiency of the public service." NTEU, --- U.S. at ----, 115 S.Ct. at 1017.
 
 
 40
 It is unclear how (if at all) the Pickering balance differs where the regulation of employee speech involves some form of prior restraint, such as the present pre-publication review procedure. The few cases in which the question has arisen concern actual prohibition of speech, not merely pre-publication review, and the test in these cases has not been uniform. In two cases, Snepp v. United States, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980), and Zook v. Brown, 865 F.2d 887 (7th Cir.1989), the courts essentially applied Pickering. In Snepp the Court considered a provision forbidding publication of CIA-related material by any current or former CIA employee unless the agency determined in advance that the material did not contain any classified information. 444 U.S. at 507-08, 100 S.Ct. at 764-65. The Court seemed to view the provision as obviously constitutional; its brief analysis noted that because Snepp was an employee of the CIA, the agency was entitled to "act[ ] to protect substantial government interests by imposing reasonable restrictions" on his speech. Id. at 509 n. 3, 100 S.Ct. at 766 n. 3 (citing U.S. Civil Service Comm'n v. Letter Carriers, 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973)); see Letter Carriers, 413 U.S. at 564-67, 93 S.Ct. at 2890-91 (stating and applying Pickering formulation). Likewise, in Zook, the court emphatically rejected the [318 U.S.App.D.C. 431] employee's attempt to analogize prior restrictions on his speech to the sort of classic prior restraint that under Near v. Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931), carries a heavy presumption of constitutional invalidity. 886 F.2d at 890-91. Instead the court applied Pickering balancing and upheld a requirement of prior written approval for commercial endorsements by law enforcement officers. Id. at 891-92.
 
 
 41
 A second type of test first appeared in the Supreme Court's decision in Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), which involved a service member's challenge to Air Force regulations requiring prior approval for on-base circulation of petitions. The Court seemed to apply a version of the "intermediate scrutiny" test set forth in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); it upheld the regulations, which applied to employees and non-employees alike, on finding that they "protect a substantial Government interest unrelated to the suppression of expression," and "restrict no more speech than is reasonably necessary to protect the substantial governmental interest." Brown, 444 U.S. at 354, 355, 100 S.Ct. at 599, 600; see also United States v. Marchetti, 466 F.2d 1309, 1315-17 (4th Cir.1972) (upholding a scheme of prepublication review and bans on CIA employee's disclosure of classified information on the ground that the government's interest in secrecy was substantial and the challenged scheme a reasonable means for protecting it). Our decision in McGehee v. Casey, 718 F.2d 1137 (D.C.Cir.1983), involving a challenge to a scheme similar to that in Marchetti, contains strands of both Pickering balancing and the Brown test; we emphasized that McGehee's status as an employee was "critical to our first amendment analysis" under Pickering and its progeny, and we also invoked and applied the two-part test set out in Brown. Id. at 1141-43. Cf. Alderman v. Philadelphia Hous. Auth., 496 F.2d 164, 168-70, 173-74 (3d Cir.1974) (striking down a temporary ban on all employee speech on specified matters, having used both the language of Pickering and a test derived from non-employment cases, requiring "compelling proof " that the restriction is "essential to a vital government interest").
 
 
 42
 Even Brown itself did not completely ignore the special authority of the government as employer. Responding to the employee's effort to distinguish Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding restrictions on speech on military bases against challenge by non-military personnel), on the ground that Spock and his associates were "civilians who had no specific right to enter a military base," the Court answered that the distinction cut the other way. The government, it said, has the authority to "subject its employees to such special restrictions on free expression as are reasonably necessary to promote effective government." Brown, 444 U.S. at 356 n. 13, 100 S.Ct. at 601 n. 13 (citing Letter Carriers, 413 U.S. at 565, 93 S.Ct. at 2890-91). Thus, while the Court plainly regarded the Air Force regulations as sustainable under an O'Brien-type test, it at least implicitly suggested an alternative mode of analysis--the Pickering balance, with the detriments of prior restraints simply among the factors to be considered. There is certainly no logical reason to think that the existence of some element of prior restraint should remove a restriction on employee speech from the usual Pickering approach. The importance of the employment context--implying a substantially voluntary assumption of special burdens in exchange for special opportunities, as well as the complex and subtle interests peculiar to any employer's needs in making effective use of its workforce--seems to us to dominate the special concerns about prior restraints. This is especially so because Pickering can readily count those concerns in the course of the balance.
 
 
 43
 Applying the test of Pickering and NTEU, we find that 3 FAM § 628.2 clearly passes muster. As we have said, the regulation--interpreted narrowly to avoid constitutional difficulties--requires only that employees submit to a process of prepublication review. No speech is forbidden. (The dissent's statement that the government is claiming a need to exercise "total control over all public speech of its employees in the foreign policy arena," see Dissent at 443 (emphasis added), [318 U.S.App.D.C. 432] might be true of the regulation as the dissent would construe it, but not of the interpretation adopted by us. Compare Dissent at 440 (apparently proposing to assess the constitutionality of § 628.2 under the majority's reading of it).) The primary burden on employees from the regulation is simply the delay associated with submitting to the review process prior to publication. If the prior review were extensive, of course, it might delay constitutionally protected speech to a time when its only relevance was to historians, see, e.g., FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 228, 110 S.Ct. 596, 606, 107 L.Ed.2d 603 (1990), but Weaver has not alleged that the review under § 628.2 is lengthy.
 
 
 44
 Weaver argues, however, that the review process imposes burdens beyond delay because the government, though lacking the authority to prohibit publication of unapproved material, may informally pressure employees to make the desired changes. But if publication without the change could be punished after the fact under Pickering, then presumably the employee is not made worse off by having advance notice of the government's view. If, on the other hand, publication of the unaltered material cannot constitutionally be punished, then the employee has nothing to fear by going ahead. The risk that tighter standards will be applied in the advance review process than would actually be applied in penalty proceedings after publication is present only in a fairly dilute form, since non-approval means only that the agency has not welcomed the material into its safe harbor. All in all, then, the delay and discouragement effects here seem a considerably milder deterrent to speech than NTEU's ban on honoraria or the limitation on reimbursement of expenses in Sanjour.
 
 
 45
 Our dissenting colleague says that the review process is harmful because it "alert[s] the authorities to [an] offensive publication." Dissent at 445. But that advance alert is necessary for the legitimate functions of the regulation (discussed below); so far as ability to punish the employee after publication is concerned, agencies seem likely to have many other ways of learning of their employees' publications on matters of official concern, especially ones that they find objectionable. Our colleague also argues that a reviewing official who has taken a rejectionist stance in the review process will likely persist, making ultimate punishment (on a basis independent of § 628.2) more probable. Id. at 445-446. We think any such increase in probability likely to be modest. Because the review process is not lengthy and takes place without the luxury of full consideration of all relevant factors, see p. 13 above, it is presumably understood as preliminary. Such processes are normally thought not to create a serious risk of prejudice in a later, "final" decision. Cf. Withrow v. Larkin, 421 U.S. 35, 55, 95 S.Ct. 1456, 1468-69, 43 L.Ed.2d 712 (1975) (board's role as investigator and initiator of license revocation proceeding does not bar it from adjudicating the revocation).
 
 
 46
 As to the interests supporting the requirement of prepublication review, the government identifies several ways in which it promotes efficiency in the performance of public duties. First, the process permits the government to take corrective action before the unauthorized disclosure of classified information occurs. Affidavit of Deputy Secretary of State George B. High at 1 (July 7, 1988). The Supreme Court has ranked the government's interest in protecting classified information as a compelling one. Snepp, 444 U.S. at 509 n. 3, 100 S.Ct. at 766 n. 3; see also McGehee, 718 F.2d at 1143. While 3 FAM § 628.2 applies to personnel without direct access to classified information, High's affidavit points out that even employees without such direct access may inadvertently, and even unknowingly, come into contact with classified information. Cf. Snepp, 444 U.S. at 512, 100 S.Ct. at 766-67 (employee relying on own judgment as to what is harmful to U.S. interests may overlook factors that agency's broader perspective enables it to identify).
 
 
 47
 The government also identifies other interests in support of the review requirement--as indeed it must in light of the regulation's explicit focus on such considerations as the conclusions to be drawn from information and the consistency of the employee's material [318 U.S.App.D.C. 433] with current foreign policy. See 3 FAM § 628.2b & c.[4] As High's affidavit says, the review process enables the agency to "take corrective action before publication of statements ... which would insult or embarrass foreign governments or foreign leaders, adversely affecting the United States' relations with such government or leader," and to "assure that statements attributed to a [covered] employee do not confuse or mislead ... foreign governments regarding the substance of U.S. foreign policy as articulated by the President and the Secretary of State." High affidavit at 2. The government's assertion of these goals is quite consistent with its position that § 628.2 expresses no substantive veto power, for the early warning alone enables the government to contact foreign powers and assuage their concerns about U.S. policy. We do not at all say (nor do we think) that "hyperbole about vague and speculative damage to our foreign interests" can "justify abridgement of our citizens' freedoms." Dissent at 446-447 (emphasis added). We are concerned here with employees, whose job-related speech may be restrained in ways that would be "plainly unconstitutional if applied to the public at large." NTEU, --- U.S. at ----, 115 S.Ct. at 1012. And we do not see quite such a huge gap as is espied by the dissent between the interests of the State Department, USIA and AID in accomplishing their mission efficiently (a legitimate basis for restricting employees' speech) and the foreign policy interests of the United States. Compare Dissent at 441-443.
 
 
 48
 We now consider whether § 628.2 is "reasonably necessary to protect the efficiency of the public service," NTEU, --- U.S. ----, 115 S.Ct. at 1017, an aspect of the Pickering balance addressing the fitness of the restraint to the stated goals. First, the advance nature of the review is at a minimum "reasonably necessary" to protect the government's interests. As to classified information, advance review is plainly essential to preventing dissemination of the information.[5] And as to other sensitive material, only review before publication enables the government to take preemptive rather than merely reactive steps in response. Cf. Snepp, 444 U.S. at 513 n. 8, 100 S.Ct. at 767 n. 8.
 
 
 49
 As to the duration of the review process, we have already noted that Weaver makes no claim of long delays. Of course even a short waiting period might in some cases affect the relevance of information of immediate or pressing interest, but we do not think those who have secured formal roles explicating and advancing U.S. foreign policy--or even those who have found employment in an agency charged with that role--have a transcendent interest in instant publication of statements made on agency-related matters. The delay associated with prepublication review at VOA appears likely to be greatest when perceived problems in the material necessitate consultation with the USIA's Office of Public Liaison, which in turn may consult appropriate experts. Coonrod Affidavit at 2. That may take more time than would one-stop review, but Weaver offers no reason to think that the overall process would take longer than "reasonably necessary." In any event, the Coonrod affidavit notes that consultation with the Office of Public Liaison had not been necessary in Coonrod's tenure at VOA, which the affidavit indicates had been at least two years at the time of the affidavit.
 
 
 50
 [318 U.S.App.D.C. 434] It is true that § 628.2 contains no specific limit on the duration of the review process--a feature that is typically fatal outside the employment context. See FW/PBS, 493 U.S. at 226, 110 S.Ct. at 605 ("[A] prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible.") (citing cases).[6] But as we have seen, courts have uniformly assessed prior restraints in the setting of government employment by standards less demanding than those used for traditional prior restraints. We have found no case holding that a review process--or indeed any form of prior restraint, even one including substantive prohibition of speech--in the context of an employment relationship is constitutionally invalid for want of a specific deadline on action. Thus we reject the idea that prior review in the employment context must proceed under a pre-set time limit.
 
 
 51
 Finally, there is nothing unreasonable in the application of § 628.2 to all agency employees--even ones without direct access to classified information or sensitive foreign policy developments--because of the risk of unintended leakage of classified or other sensitive information. Indeed, the review process may be particularly important in precisely such cases, as unintended recipients of information are especially likely to have no idea that their material may harbor damaging disclosures. We do not say that the government's interests absolutely necessitate the precise contours of the review process in the case of each and every employee "from the secretary pool on up to director," see Dissent at 443, but merely that the review scheme restricts no more speech than is "reasonably necessary" to achieve the government's interests, see NTEU, --- U.S. at ----, 115 S.Ct. at 1017.
 
 
 52
 Accordingly, we find the prepublication review scheme valid under Pickering and NTEU. We affirm the dismissal of Counts II and III of Weaver's complaint on exhaustion grounds and affirm the dismissal of Count I on the merits.
 
 
 53
 So ordered.
 
 WALD, Circuit Judge, dissenting:
 
 54
 The majority's opinion is a triumph of judicial inventiveness. In a credulity-defying exercise, my colleagues conclude that the challenged prepublication clearance regulation permits the VOA only to require review of employee-authored publications and to offer advice to authors, not to forbid publication of manuscripts until agency consent has been bestowed--reaching this conclusion despite the regulation's unequivocal statements that all materials of official concern "shall be submitted ... for clearance," no material may be published "until it has been cleared," and "[c]learance will not be granted" until the employee has deleted all objectionable material.
 
 
 55
 The majority's interpretation is one only a lawyer could love--or comprehend. Carolyn Weaver, the non-lawyer plaintiff in this case, says she did not understand the regulation as authorizing only review and advice. Nor, so far as can be ascertained, did any other employee of the VOA read the regulation this way--for by the agency's own admission every single employee who submitted material for review subsequently made all the changes "suggested" by the official reviewers before publication. Nor has the VOA presented a shred of evidence that it read the regulation in so benign a fashion before this litigation began. To the contrary, the agency issued an internal directive and circulated an annual "reminder" to its employees that they could not publish any material without agency "approval." Yet, despite the unambiguous language of the regulation, undisputed evidence that the regulation was understood by VOA employees to mean exactly what it said, and the consistent position of the VOA before this litigation that it did require agency approval of employee manuscripts before publication, my colleagues have adopted a contrary reading, offered by the agency for the first time during the course of this litigation, in an obvious attempt to save the regulation from a slam-dunk finding of unconstitutionality.
 
 
 56
 [318 U.S.App.D.C. 435] But even if the majority could distort the regulation's plain meaning and transform the proverbial sow's ear into a silk purse, by ruling that the regulation only authorizes review and advice, the magic would be for nought since, in my view, the regulation would still violate the First Amendment. The courts have consistently held that regulations which burden--even if they do not completely restrict--employees' speech nonetheless may run afoul of the Constitution. See, e.g., United States v. National Treasury Employees Union, --- U.S. ----, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("nteu"); SANJOUR V. EPA, 56 F.3D 85 (D.C.CIR.1995) (en banc). in those cases where the government restricts the speech of its employees, it must show that the harms from reducing employees' speech are outweighed by the government's interest in efficiently carrying out its mission by minimizing harms that "are real, not merely conjectural." NTEU, --- U.S. at ----, 115 S.Ct. at 1017 (quoting Turner Broadcasting System, Inc. v. FCC, 512 U.S. ----, ----, 114 S.Ct. 2445, 2450, 129 L.Ed.2d 497 (1994) (Kennedy, J., plurality)).
 
 
 57
 Here, the government has offered us no more than a few vague statements about speculative damage to the foreign relations of the United States to justify a formidable restriction on its employees' speech. With the possible exception of review for the inadvertent disclosure of classified information, the VOA has failed to meet its burden of showing harms that "are real, not merely conjectural," because the alleged harms do not implicate the interests of the VOA as an employer in carrying out its operational mission. On the other hand, even as (mis)construed by the majority, the regulation significantly chills free speech by requiring the submission of all employee-written articles on subjects of "official concern" for prepublication review and critique, thus increasing the likelihood of subsequent sanctions for any non-redacted publication, and "inducing excessive caution in the speaker." Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973). Under either the majority's highly questionable interpretation of the regulation, or the ordinary reading anyone outside this litigation would give it, the regulation is unconstitutional.
 
 A. Interpreting the FAM regulation
 
 58
 The first question in this case is whether the FAM regulation authorizes the government to prohibit the publication of offensive materials, i.e., to say that material may not be published and to punish an employee if such prohibition is defied, or whether it merely authorizes the VOA to review publications and make comments or suggestions to the author about any objectionable content. My colleagues concede that if the regulation allowed the government to punish employees for publishing over agency objections, it "would raise serious constitutional issues," Majority opinion ("Maj. op.") at 426, a conclusion mandated by our prior declaration in McGehee v. Casey, 718 F.2d 1137, 1141 (D.C.Cir.1983): "The government has no legitimate interest in censoring unclassified materials." The only possible way out of this precedential corner for the agency and my colleagues is to construe this regulation as authorizing the agency only to review publications and make non-binding suggestions, while allowing the employee to publish over agency objections (with the risk of post-publication sanctions based on the material's content, but without the possibility of discipline merely for defying the censor's recommendations).
 
 
 59
 Predictably, the majority reads the regulation precisely this way. Relying on the canon that "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," my colleagues conclude that the regulation permits the government only to offer advice, not to threaten discipline for publication in the event the advice is rejected. See Maj. op. at 427 (quoting United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 659, 60 L.Ed. 1061 (1916)).
 
 
 60
 I strongly disagree with my colleagues' interpretation of the regulation. Like them, I have no desire to seek out constitutional infirmities in any governmental regulations. But there is a limit. The procrustean interpretation advanced by the majority runs [318 U.S.App.D.C. 436] completely counter to the text and plain meaning of the regulation as well as the interpretation of the regulation advanced by the agency (right up until this litigation), and the understanding of the regulation by VOA employees. Their revisionist interpretation of this regulation is a semantic wonder.
 
 1. The plain meaning of the regulation
 
 61
 We are all familiar with the time-honored canon of construing statutes so as to avoid constitutional difficulties. But even under this canon, we must give the text a "reasonable construction." Hooper v. California, 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895). Much as we might like to avoid constitutional issues, judges cannot stretch the words of a statute to the point of "disingenuous evasion." Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933). I repeat here the key provisions at issue to put in high relief the absurdity of the "review and advice" interpretation the majority advances.
 
 
 62
 Section 628.2, entitled "General Policy and Procedures," provides:
 
 
 63
 a.... All speaking, writing, and teaching materials which may reasonably be interpreted as relating to the current responsibilities, programs, or operations of any employee's agency or to current U.S. foreign policies, or which reasonably may be expected to affect the foreign relations of the Untied States are of official concern and shall be submitted, as provided in the following pertinent sections, for clearance by the employee's agency, whether the employee is acting officially or privately.
 
 
 64
 b. No employee shall publish any material of official concern under paragraph a until it has been cleared. The purpose of this clearance requirement is to substitute the agency's institutional judgment for the employee's judgment when the question involved concerns either the release or accuracy of information concerning the employee's agency's responsibilities or what conclusions should be drawn from such information....
 
 
 65
 c. Clearance will not be granted until all classified material and all material of official concern under paragraph a which is inaccurate, inconsistent with current foreign policy, or can reasonably be expected to affect adversely U.S. foreign relations, has been deleted from the proposed speaking, writing, or teaching material.
 
 
 66
 The regulation indisputably provides: (a) All materials relating to current agency programs or U.S. foreign policy "shall be submitted ... for clearance;" (b) No material may be published "until it has been cleared;" and (c) "Clearance will not be granted" until the employee has deleted the objectionable material. The only conclusion to be drawn from (a)-(c) is that if the employee publishes material of "official concern" without prior agency approval she has violated agency regulations and can expect to be punished.
 
 
 67
 The majority nonetheless says these provisions are "not entirely clear," and goes on to construe them in a way that would require the agency to tell an employee her material "is inaccurate, inconsistent with current foreign policy, or can reasonably be expected to affect adversely U.S. foreign relations," but that she may publish it anyway, although she may later be disciplined for it. This would be true, of course, only if the regulation is construed to mean: (1) The government may give clearance even if the objectionable material is not deleted; or (2) The employee may publish the material even if she does not receive clearance. Both of these interpretations are flatly contradicted by the text of the regulation.[1]
 
 
 68
 [318 U.S.App.D.C. 437] In order to arrive at their unnatural interpretation of the regulation, my colleagues are forced to read the word "cleared" in § 628.2(b) to mean something entirely different from "clearance" in § 628.2(c). See Maj. op. at 428. Thus they read "cleared" in subsection (b) to mean publication is prohibited until a manuscript has "been through the review process," while "clearance" in subsection (c) means "agency approval" will be withheld until the offensive material is deleted. Id. (emphases added).
 
 
 69
 This reading is of course in derogation of the familiar judicial presumption that "identical words used in different parts of the same act are intended to have the same meaning." Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932); see also Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) (quoting Sorenson v. Secretary of Treasury, 475 U.S. 851, 860, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986) (quoting Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934) (quoting Atlantic Cleaners))). The majority, however, brushes off this line of cases, saying that "[l]ike all rules of statutory construction ... this one is defeasible." Maj. op. at 428.
 
 
 70
 The Supreme Court in Atlantic Cleaners, however, identified only three situations in which the same-word same-meaning presumption would not apply: "[w]here the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another...." 286 U.S. at 433, 52 S.Ct. at 609. None of those rationales applies here.[2] The subject matter of subsections (b) and (c) is identical--both deal with the prepublication clearance requirement. Similarly, there is no difference in the conditions under which the two subsections apply. And finally, unlike the situation in Atlantic Cleaners, the power exercised by the agency in promulgating subsection (b) is exactly the same as the power involved in promulgating subsection (c).[3] This is not a situation involving use of the same word in two different sections of a variegated regulatory statute such as the Sherman Act. Nor is it a situation where the word in question--"clearance"--has a technical, rather than ordinary meaning. Cf. Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (finding that the term "allowed secured claim" could have a different meaning in different subsections of the Bankruptcy Code). "Clearance" is a commonplace word which can reasonably be expected to retain its ordinary meaning within the confines of one section of one regulation dealing with one procedure, not to take on novel and different meanings from one adjacent subsection to another without any indication to the reader that the agency intended different meanings to prevail.[4]
 
 
 71
 [318 U.S.App.D.C. 438] 2. The VOA's own interpretation
 
 
 72
 The VOA never suggested before this litigation that there was any ambiguity in its prepublication clearance regulation, nor does the majority provide any such evidence as a launching-pad for its own latter-day interpretation. To the contrary, in an internal directive issued in 1986, two years before this litigation originated, the VOA said:
 
 
 73
 An employee must obtain specific advance approval before engaging in speaking, writing, or teaching on subject matter of official concern; ... Approval will not be granted if the speech, written product, or course contains classified material or material of official concern which is inaccurate, incompatible with current U.S. foreign policy, or can reasonably be expected to affect U.S. foreign policy adversely.
 
 
 74
 VOA Directive D-1731A, reprinted in App. 74 (emphasis added). This directive could not be more unqualified on the point: getting clearance from the agency requires getting its approval before publication. Thus the regulation says "[n]o employee shall publish any material of official concern under paragraph a until it has been cleared," while the complementing directive says "[a]n employee must obtain specific advance approval." Similarly, the regulation says "Clearance will not be granted ...," while the directive says "Approval will not be granted. ..."[5] The VOA's pre-litigation interpretation, as expressed in the directive, is altogether consistent with the dictionary definition of "clearance" as "approval or certification as clear of objection ... permission to proceed without objection," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 420 (1968), and is a much more natural reading than the majority's construction that "until it has been cleared" means "until it has been through the clearance process," whatever the outcome.[6]
 
 
 75
 My colleagues admit, "[i]t is true that the government's procedural interpretation of the regulation was advanced only in this litigation, and that VOA had in fact adopted an alternative interpretation in an internal directive." Maj. op. at 429. This is an all-time understatement, for the directive offered not an alternative interpretation, but a completely opposite interpretation from the position now advanced by the VOA. Nor is there any question here that the VOA previously represented that its directive--signed by Director Richard Carlson--was the official policy of the agency. Indeed, when Weaver was admonished for failure to comply with agency regulations, the VOA cited not only her violation of the FAM regulation, but her violation of the directive.[7]
 
 
 76
 Until today, I thought it clearly established in law that a person whose behavior is being regulated is entitled to rely on the representations made by the agency as to what the regulation means. See Cox v. Louisiana, 379 U.S. 559, 568-69, 85 S.Ct. 476, 483, 13 L.Ed.2d 487 (1965) (individuals would "justifiably tend to rely on ... [an] administrative [318 U.S.App.D.C. 439] interpretation of how 'near' the courthouse a particular demonstration might take place"); Omnipoint Corp. v. FCC, 78 F.3d 620, 636 (D.C.Cir.1996) (elimination of provision "would have harmed many of the minority-owned businesses that had been relying upon the rule"); International Union, United Automobile, Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 248 (D.C.Cir.1986) ("employers will justifiably rely on the Department's interpretation"). Apparently, the new law of this circuit is that employees are expected to disregard the plain language of regulations as well as the agency's own directives, and instead anticipate that the agency may take a 180-degree different position when called to task in court. That is just plain wrong, and cannot be the law.
 
 
 77
 Once an agency has told its employees that they cannot publish their material until it has been approved, and has in effect coerced them into changing their publications over the years to satisfy "official" concerns, it is fundamentally unfair to let the agency invoke a canon of statutory construction designed to avoid constitutional issues in order to sanitize the unconstitutional practice they have been engaged in. Here the past practice of the VOA and the text of the regulation reveal the burden on employees "too distinctly to permit us to ignore it." Moore Ice Cream, 289 U.S. at 379, 53 S.Ct. at 622.
 
 
 78
 Justice O'Connor has pointed out, "even such an important canon of statutory construction as that favoring the avoidance of serious constitutional questions does not always carry the day." Gutierrez de Martinez v. Lamagno, --- U.S. ----, ----, 115 S.Ct. 2227, 2238, 132 L.Ed.2d 375 (1995) (O'Connor, J., concurring). In this case, using the canon to validate a deathbed conversion when the agency is finally called to account by an employee would completely pervert the function of judicial review. Our government must be accountable to its citizens, and it is antithetical to that principle to allow an agency which has maintained an unconstitutional regulation on the books for years and has repeatedly enforced it against its employees, to escape all responsibility by saying, "we're sorry; we won't do that any more."[8]
 
 
 79
 As my colleagues would have it, however, so long as the regulation is ultimately given a judicial construction that is arguably constitutional, no harm has been done. Not so. The harm consists in the chill to free speech from employees who have in the past and may in the future reasonably believe the regulation requires them to make changes in their manuscripts to gain "clearance." As the VOA candidly admits, "[t]o the best of our recollection, no VOA employee has refused to make changes...." Coonrod Affidavit at 2, reprinted in App. 67. What better evidence could there be that employees for years have believed they were required to make the "suggested" changes than the fact that every single one complied? Indeed, if there had really been any ambiguity in the regulation as to an employee's freedom to publish manuscripts over the agency's disapproval, that ambiguity would have rendered it just as dangerous to First Amendment freedoms as a regulation which banned publication outright. The ambiguity--as this case sadly illustrates--would allow the agency to roar like a lion before its employees, and effectively censor the publication of materials it disfavors, yet retreat like a lamb when challenged in court. Ambiguous regulations which affect basic freedoms need to be rewritten, not reinterpreted.
 
 
 80
 The majority's approach, which in essence rewards the agency for the alleged ambiguity in its regulation, is directly contrary to the Supreme Court's holding in Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), where the Court [318 U.S.App.D.C. 440] struck down New York's teacher loyalty laws and regulations. In that case, the words "treasonable" and "seditious" were undefined, but the Supreme Court rejected the approach of giving those words the most benign possible reading, noting instead the pervasive in terrorem effects on the teachers occasioned by the laws. The Court said:
 
 
 81
 When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone...." For "[t]he threat of sanctions may deter ... almost as potently as the actual application of sanctions." The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed.
 
 
 82
 385 U.S. at 589, 87 S.Ct. at 675 (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958); NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)). Just so here.
 
 
 83
 At the end of the day, the majority's reading so breathtakingly departs from the text of the regulation that no canon of construction can justify it. It would of course be a bit easier to defend the regulation if it only authorized review and advice. But as a court we must take regulations as we find them, and as they are plausibly read by those subject to them. It is not our proper function to "torture one poor word ten thousand ways" to save the agency's skin. JOHN DRYDEN, MAC FLECKNOE, Line 210, reprinted in BARTLETT'S FAMILIAR QUOTATIONS 369 (14th ed.1973).
 
 
 84
 B. The Constitutionality of the FAM Regulation
 
 
 85
 Even if the majority's reading of the regulation were legitimate, its interpretation would not resolve the serious constitutional issues raised by so broad a prepublication clearance requirement. Assuming that the VOA forever after adhered to the "review and advice" interpretation it has advanced in this litigation, I still do not think that the regulation would pass constitutional scrutiny.
 
 1. The Pickering/NTEU balancing test
 
 86
 This court, sitting en banc, recently had the opportunity to discuss at length the test to be applied to regulations governing the non-official speech of government employees. Sanjour v. EPA, 56 F.3d at 85. Provided that the speech at issue is on "matters of public concern," Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), we apply the "Pickering/NTEU" test to any significant restraint the government places on it:
 
 
 87
 The government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the government.
 
 
 88
 NTEU, --- U.S. at ----, 115 S.Ct. at 1014 (quoting Pickering v. Board of Education, 391 U.S. 563, 571, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968)).
 
 
 89
 The duty of the courts, therefore, is to ensure that there is a proper balance between "the full protection of speech upon issues of public concern" and the "practical realities involved in the administration of a government office." Connick v. Myers, 461 U.S. at 154, 103 S.Ct. at 1694. Although courts consistently have held that the government may regulate the speech of its employees more stringently than that of the general public, they have not always made explicit the reasons for this difference. Thus the Supreme Court asked rhetorically in Waters v. Churchill, 511 U.S. 661, ----, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994): "What is it about the government's role as employer that gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large?" This is the answer the Court gave:
 
 
 90
 [T]he extra power the government has in this area comes from the nature of the government's mission as an employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to [318 U.S.App.D.C. 441] do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.... The key to First Amendment analysis of government employment decisions, then, is this: the government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.
 
 
 91
 511 U.S. at ---- - ----, 114 S.Ct. at 1887-88 (emphasis added).
 
 
 92
 This observation, in my opinion, is the key element ignored by the majority in its constitutional analysis. The government's enhanced power to regulate the speech of its employees arises not from the government's interests in avoiding embarrassment to foreign governments, or generalized harm to the United States' foreign policy interests, but only from its interests as an employer in "doing particular tasks ... as effectively as possible." Id.
 
 
 93
 In the case of a government agency charged with conducting our foreign affairs, the agency's interests in carrying out its mission may well overlap with the foreign policy interests of the United States. No one would quarrel with the dismissal of an Undersecretary of State who wrote an article critical of the Secretary and the government's foreign policy. But the dismissal would be warranted not because of harm to the United States' foreign policy interests per se, but because in this case, it would interfere with the effective operation of the State Department. As the Court said in Waters, "The reason the governor may ... fire the deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively." 511 U.S. at ----, 114 S.Ct. at 1888.
 
 
 94
 Thus the mere invocation of "foreign relations" has no talismanic significance in First Amendment jurisprudence. When an agency engaged in foreign relations wishes to justify limiting its employees' speech it must do so in light of the effective performance of its particular mission, just as an agency charged with protecting the environment can regulate the speech of its employees only if it interferes with that agency's conservationist mission. It is not sufficient for the government simply to say that every criticism of its foreign policy leadership by an employee will undermine its "important mission" or its goals of "efficiency."[9] Rather, the government must specifically show why speech-restricting regulations are necessary for the efficient conduct of its mission.[10]
 
 
 95
 Thus in Snepp v. United States, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam), the Supreme Court upheld the validity of a written agreement by a former CIA agent requiring him to submit all CIA-related writings for prepublication clearance by the agency, a requirement designed to ensure the protection of classified information. In its ruling, the Court took pains to point out: "Undisputed evidence in this case shows [318 U.S.App.D.C. 442] that a CIA agent's violation of his obligation to submit writings about the Agency for prepublication review impairs the CIA's ability to perform its statutory duties." 444 U.S. at 512, 100 S.Ct. at 767 (emphasis added). The basis for that finding included evidence that "sources" had discontinued working with the CIA after Snepp had published his book, citing fear that the CIA could not effectively keep their identities secret. Id. at 512-13, 100 S.Ct. at 766-67. Relying on Snepp, our court later approved a CIA "secrecy agreement" requiring clearance of all employee publications containing classified information. McGehee v. Casey, 718 F.2d at 1147. See also United States v. Marchetti, 466 F.2d 1309, 1316 (4th Cir.) (CIA secrecy agreements "are entirely appropriate to a program in implementation of the congressional direction of secrecy"), cert. denied, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972). These cases all held that the CIA's interests in operating a secret intelligence-gathering agency, relying on an extensive network of informants, justified the broad prepublication clearance regulation to protect against disclosure of classified national security information and sources. Similarly, in Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), the Court upheld an Air Force regulation prohibiting servicemembers from soliciting signatures on petitions without their commander's approval, on the basis of the " 'different character of the military community and of the military mission ... [with its] overriding demands of discipline and duty.' " Id. at 354, 100 S.Ct. at 599 (quoting Parker v. Levy, 417 U.S. 733, 744, 758, 94 S.Ct. 2547, 2556, 2563, 41 L.Ed.2d 439 (1974)).
 
 
 96
 In Snepp and its progeny as well as in Brown, the governmental interests implicated by the prepublication clearance requirements were clearly articulated and strong. The Director of Central Intelligence, for example, had a specific statutory mandate to "protect[ ] intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403(d)(3). Obviously, any disclosure of classified information "including information regarding intelligence sources and methods," Snepp, 444 U.S. at 511, 100 S.Ct. at 766, inadvertent or not, would directly and materially affect this mission. As the Court said, "[w]hen a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA--with its broader understanding of what may expose classified information and confidential sources--could have identified as harmful." Id. at 512, 100 S.Ct. at 766.
 
 
 97
 Thus as a general principle, government review for classified information by agencies like the CIA does not violate the First Amendment. The VOA, however, has not convincingly demonstrated that it needs to conduct such review in the case of all its employees. The VOA is not an intelligence-gathering agency. Its mission is to distribute public information to the rest of the world, and it is required by its charter to adhere to journalistic principles, not those of spycraft.[11] Weaver, for her part, has only a "non-critical confidential" clearance, and her work consists of digesting public news information for re-broadcast. She says she has never encountered any classified information in her time at VOA, and according to her affidavit, at the time this litigation commenced the VOA operated out of a building shared with the Department of Health and Human Services at which employees did not even regularly have to present identification [318 U.S.App.D.C. 443] cards. Although the record is not at all clear on the point, I seriously question whether the government has demonstrated its need to review for classified information for all VOA employees.
 
 
 98
 But even if it had, that justification would not give it the right "to substitute the agency's institutional judgment for the employee's judgment when the question involved concerns either the release or accuracy of information concerning the employee's agency's responsibilities or what conclusions should be drawn from such information." 3 FAM § 628.2(b). This sweeping prepublication review based on the manuscript's content (and the author's viewpoint and "conclusions") goes far beyond review for classified information, and is not justified by anything in Snepp or any other case.
 
 2. The Harms Here
 The Supreme Court has said:
 
 99
 When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.
 
 
 100
 NTEU, --- U.S. at ----, 115 S.Ct. at 1017 (quoting Turner Broadcasting System, Inc., v. FCC, --- U.S. at ----, 114 S.Ct. at 2470). And we must "limit our inquiry to the 'interests the state itself asserts.' " Sanjour, 56 F.3d at 96 (quoting Edenfield v. Fane, 507 U.S. 761, 768, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993)). In its brief, the government offered the following justification for the prepublication clearance regime:
 
 
 101
 The regulations serve a significant governmental interest unrelated to the suppression of speech. Substantial foreign policy and national security interests support the prepublication regulations. One of the paramount purposes of the regulation is to prevent the unknowing disclosure or dissemination of classified information which could harm the vital security interests of the United States.... It is also important that the Voice of America, as is succinctly expressed in its charter, is apolitical. A fundamental feature of the important foreign policy objectives it serves for the United States is to report to the people of other nations in a manner that is truthful, objective, reliable, and nonpolitical. The insertion of VOA or its employees into the press or public debate on a freelance basis on sensitive matters of security or foreign relations could threaten the basic purposes of VOA. Such activity could jeopardize security, disrupt foreign relations, and impair the important mission of the Agency.
 
 Brief for Appellee at 18-19.[12]
 
 102
 Aside from preventing the disclosure of classified information--which might, if the VOA were to adduce convincing evidence of its need, justify a narrow review--the principal harm the agency posits is that any VOA employee, from the secretary pool on up to director, proffering any facts, classified or not, or drawing any conclusions from such facts that do not represent the agency's official version on any matter affecting foreign relations, presents a potential danger to the agency's mission. The agency is saying in effect that to perform its mission efficiently it must exercise total control over all public speech of its employees in the foreign policy arena. This is a broad definition of "efficiency" indeed, which transcends all limits derived from prior Supreme Court doctrine on government employee speech.
 
 
 103
 The Supreme Court has recognized that "[g]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." Waters, 511 U.S. at ----, 114 S.Ct. at 1887. Yet the VOA fears "the insertion of VOA or its employees into the press or public debate on [318 U.S.App.D.C. 444] a freelance basis...." Brief for Appellee at 19. The notion that an article by a part-time employee in the Columbia Journalism Review containing not a shred of classified information could somehow "jeopardize security" or "disrupt foreign relations" simply has no support in this record.
 
 
 104
 Obviously it is in the nature of all prior restraints such as licensing and prepublication review that it will be harder for the government to prove the existence of specific harms from all--or even any sizeable number of publications encompassed by the regulation. The breadth of a regulation like this will inevitably restrict much, much more speech than could possibly present a risk of harm to the government's legitimate interests. That is precisely why any such prepublication review must have a narrow and well-justified objective. That is also why punishment after the fact--when the precise harm can be identified--is far preferable, with the exception of those rare circumstances (such as the disclosure of classified information or the exposure of government sources) where the harm is grave and irreparable.
 
 
 105
 The harms posited by the VOA do not even come close to those identified by the CIA in Snepp and McGehee. How, for example, will improper "conclusions" drawn by a lower-echelon VOA employee be likely to jeopardize national security? The VOA never tells us. How would foreign relations be disrupted by an employee's critical evaluation of the VOA's operations or programs? The VOA cites only to the affidavit of George High, Senior Deputy Assistant of State, who speculates that the FAM regulation offers the agency the chance to take "corrective action" before publication of statements "which would insult or embarrass foreign governments or foreign leaders, adversely affecting the United States' relations with such government or leader."
 
 
 106
 We have previously noted that the concept of matters "affecting foreign relations" is an inherently vague and open-ended one, subject to abuse when it is invoked to restrict freedoms of our citizens or the press. Zweibon v. Mitchell, 516 F.2d 594, 653-54 (D.C.Cir.1975) (en banc) (holding that warrant is required before wiretap is installed on a domestic organization, even if the wiretap is justified in the name of foreign intelligence gathering or national security), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Moreover, "security" is a "broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." New York Times Co. v. United States, 403 U.S. 713, 719, 91 S.Ct. 2140, 2144, 29 L.Ed.2d 822 (1971) (Black, J., concurring).[13] In this case, just as in NTEU, "[d]eferring to the Government's speculation about the pernicious effects of thousands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections." --- U.S. at ---- n.21, 115 S.Ct. at 1018 n.21.
 
 
 107
 On the other hand, the VOA does have a legitimate interest in remaining "apolitical," and, as its charter requires, avoiding a perception that it represents "any single segment of society." Arguably, this interest could be jeopardized if an employee, purporting to speak for the VOA, interjected herself "into the press ... on a freelance basis." If so, there is an effective, narrow way to deal with that problem--require employees to include a disclaimer statement with any publication of official concern. The FAM regulations do just that, mandating that employees include "a specific statement to the effect that the opinions and views expressed are the employee's own and not necessarily those of the agency." 3 FAM § 628.5-3.[14] This requirement is sufficiently narrow and is targeted toward a real harm, thus obviating in [318 U.S.App.D.C. 445] large part the need for a total content-based prepublication critique of every employee's writings.[15] The agency has not explained why this disclaimer, when combined with its unchallenged authority to impose post-publication discipline (consistent with Pickering) in those cases where an employee's writing demonstrably disrupts the agency's operations, would fail to protect its "efficiency" interests.
 
 3. The burdens on speech
 
 108
 Because the government has shown no legitimate interests, "efficiency" or otherwise, to justify this review, even a mild intrusion would tip the balance under Pickering/NTEU toward a finding of unconstitutionality. But this regulation, however construed, represents far more than the "mild[ ] deterrent" the majority says it is. Maj. op. at 432.
 
 
 109
 In the first place, as a widespread and general restriction on speech, the regulation gives rise to "serious concerns," NTEU, --- U.S. at ----, 115 S.Ct. at 1014, and "the Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action." Id. In addition, this regulation is highly suspect because, "unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens." Id. (emphasis added). As the Supreme Court said in Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), where it struck down a city's attempt to ban the musical "Hair,"
 
 
 110
 The presumption of prior restraint is heavier--and the degree of protection broader--than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.
 
 
 111
 Id. at 558-59, 95 S.Ct. at 1246.
 
 
 112
 My colleagues, however, see no harm in the fact that the government can "informally pressure employees to make the desired changes." Maj. op. at 432. They explain:
 
 
 113
 But if publication without the change could be punished after the fact under Pickering, then presumably the employee is not made worse off by having advance notice of the government's view. If, on the other hand, publication of the unaltered material cannot constitutionally be punished, then the employee has nothing to fear by going ahead.
 
 
 114
 Id.
 
 
 115
 The majority "presum[es]" that the government is equally likely to punish materials it disapproves of with or without a prepublication review process--an assumption I believe is not warranted by experience or common sense. Let us unbundle the majority's interpretation and look at its practical effects. The employee author must submit all manuscripts to a review process, after which she will be merely "informed" if there is anything in her work which is antithetical to agency policy. The reviewer will basically tell her: "We don't like part of your article, but go ahead and publish it anyway, and see what happens." Too much is left unsaid under that scenario for it to be a credible way to run an agency. The author will clearly surmise that if she publishes despite the criticism, the chances are good she will be officially sanctioned post-publication. For by submitting her work to the review, she has alerted the authorities to her offensive publication. The reviewer in turn, by dint of his prepublication determination that her article is offensive, has upped the ante, and increased the chances that he will follow through with a recommendation for sanctions if she publishes without making the changes.
 
 
 116
 As a practical matter, then, the chances of subsequent punishment are much higher once the agency has identified the material [318 U.S.App.D.C. 446] as objectionable.[16] Just as a child is more likely to be punished after doing something she was specifically told not to, than if she had done it without such warning, it stands to reason that an employee is much more likely to be punished after ignoring the agency's exhortations. This chill is significant, for "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker...." Pittsburgh Press Co., 413 U.S. at 390, 93 S.Ct. at 2561.
 
 
 117
 I would submit that the very purpose of the regulation is to induce "caution in the speaker." "Slow down," the employee is being told in so many words. "Think about our important mission here ... and how much you like your job." The effects are not hard to predict: "It would be a bold ... [employee] who would not stay as far away as possible from utterances or acts which might jeopardize his living by enmeshing him in this intricate machinery." Keyishian, 385 U.S. at 601, 87 S.Ct. at 683; see also NAACP v. Button, 371 U.S. at 433, 83 S.Ct. at 338 ("The threat of sanctions may deter ... almost as potently as the actual application of sanctions."). What is the purpose of the official critique unless the "informal pressure" my colleagues acknowledge is supposed to have a chilling effect, forcing the employee to make her decision to publish and/or perish accordingly?
 
 
 118
 Nor does the fact that the agency might not be able to punish the employee after publication somehow blunt the harmful effect of a mandatory prepublication review. As the majority would have it, even a stern message of disapproval should not deter any employee, if she is secure that she can ultimately survive the Pickering test should the agency sanction her after publication. But what employee could feel safe in predicting ahead of time the outcome of that complex calculus? Apparently, for as long as anyone at VOA remembers, no employee has reached that level of security. "It is no answer to a claim of chilling effect that a court eventually will strike down the government's abuse of power." Rafeedie v. INS, 880 F.2d 506, 530 n. 8 (D.C.Cir.1989) (Ruth B. Ginsburg, J., concurring). For in the words of Justice Marshall:
 
 
 119
 That this Court will ultimately vindicate an employee if his speech is constitutionally protected is of little consequence--for the value of a sword of Damocles is that it hangs--not that it drops. For every employee who risks his job by testing the limits of the statute, many more will choose the cautious path and not speak at all.
 
 
 120
 Arnett v. Kennedy, 416 U.S. 134, 231, 94 S.Ct. 1633, 1682, 40 L.Ed.2d 15 (1974) (Marshall, J., dissenting).
 
 
 121
 * * *
 
 
 122
 The net result of this case is that the VOA--for no good reason--has in the past, and will in the future, be allowed to subject its employees to an exceedingly broad prepublication clearance requirement. The essence of the government's and majority's position is that this regime is justified because of the risk that a lower echelon, part-time employee who works for an essentially journalistic organization and who has never come into contact with classified information could somehow damage the foreign relations of the United States. I had thought that era well behind us where what is essentially hyperbole about vague and speculative damage to our foreign interests could be used to justify abridgment of our citizens' freedoms.
 
 
 123
 The VOA has produced no evidence of any serious evil that would justify a wide-sweeping requirement of prepublication review of all publications by any employee that touch [318 U.S.App.D.C. 447] in any way on foreign affairs or other agency-related matters. Whether rewritten, as I conclude the majority has done, to provide for official reviewers to identity all facts and conclusions the agency finds unacceptable and to "suggest" their deletion but to take no further disciplinary steps until after publication--or as presented in their original form to permit sanctions for failure to delete such material--the regulation violates employees' free speech guarantees under the First Amendment. The regulation places significant burdens on employees' expressive freedoms, without any showing that the agency has a need to see and criticize articles in advance of publication in order to conduct its operations efficiently.
 
 
 124
 The affirmation of such a prepublication clearance procedure based on viewpoint and content goes far beyond any employee restriction previously upheld by this court or the Supreme Court. Only last year, the Supreme Court cautioned:
 
 
 125
 As Justice Brandeis reminded us, a "reasonable" burden on expression requires a justification far stronger than mere speculation about serious harms. "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women.... To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced."
 
 
 126
 NTEU, --- U.S. at ----, 115 S.Ct. at 1017 (quoting Whitney v. California, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)). This case requires us to rethink that caution now, more than ever.
 
 
 127
 I respectfully but emphatically dissent.
 
 
 
 [1]
 Review of MSPB decisions at the behest of the government is available under 5 U.S.C. § 7703(d) if the Director of the Office of Personnel Management determines that the MSPB "erred in interpreting a civil service law, rule or regulation affecting personnel management" and that the decision will have a "substantial impact on a civil service law, rule, regulation, or policy directive." When this court had jurisdiction over appeals from MSPB decisions (prior to creation of the Federal Circuit), we entertained OPM petitions for review of MSPB constitutional determinations under the then-current version of § 7703(d), which stated the same conditions for availability of appeal. See, e.g., Devine v. Goodstein, 680 F.2d 243 (D.C.Cir.1982). The Federal Circuit has also entertained such petitions, as reported in unpublished dispositions, see, e.g., King v. Walsh, 1995 WL 470749 (Fed.Cir.1995), but our research has disclosed no reported cases on the issue
 
 
 [2]
 We recognize that separate adjudication of Count I might, through issue and claim preclusion doctrines, affect the viability of Weaver's quest for relief from the oral admonishment. But Weaver has signalled reasonably clearly that she has no objection to taking such risks. First, her reply brief identifies as the "gravamen" of her case the general challenge to the review requirement, as distinguished from the challenge to the particular personnel action taken against her. Reply Brief at 11. Second, after oral argument the National Treasury Employees Union ("NTEU"), as amicus on Weaver's side, filed a supplemental brief stating that Weaver was "not really looking for" a "reversal" of the oral admonishment (indeed, as NTEU points out, it is unclear how such a reversal could be accomplished), but rather was seeking a general invalidation of the review scheme. Supplemental Brief of NTEU as Amicus Curiae at 7. This brief, purporting to voice Weaver's preference, was served on Weaver's counsel--who had cooperated with amicus at least to the extent of ceding amicus half his oral argument time--and elicited no response from Weaver
 
 
 [3]
 Section 628 appears in an appendix because revised material that will take its place has not yet been "cleared for issuance." United States Department of State, Foreign Affairs Manual, Transmittal Letter PER-304 (November 8, 1995). Until that time, § 628 is "the current version in force." Id. Counsel for the government has informed us that "there has been no indication that the changes [in § 628] are imminent," and also that "as far as can be determined, the changes contemplated are not major." Because § 628 remains in force, its constitutionality is not moot
 
 
 [4]
 While the government thus acknowledges that the review scheme is in one sense broader than the provisions upheld in Snepp, McGehee, and Marchetti, it is also in a significant sense narrower than those provisions, which clearly intended substantive application and, in the case of McGehee, were in fact so applied. For this reason, the Marchetti court's dictum that the restraint there could not be sustained with respect to "information which is unclassified or officially disclosed," 466 F.2d at 1313, is not pertinent
 
 
 [5]
 Disclosure of classified information is a criminal offense punishable by up to ten years' imprisonment and a $10,000 fine. 18 U.S.C. § 798. An agency confronted with a recalcitrant employee who refused to eliminate classified information might wish to seek an injunction against publication of the offending section of the employee's material. Cf. Marchetti, 466 F.2d at 1316-17 (permitting injunction against publication of material determined by the CIA to contain classified information on the ground that criminal sanctions for disclosure might not always deter such behavior and that, in light of the serious harm that would follow from disclosure, "more positive assurance" is warranted)
 
 
 [6]
 The record indicates that USIA imposes a 30-day limit on prepublication review, see United States Information Agency, Announcement No. 38, at 2 (Feb. 5, 1988), but does not indicate whether a similar time limit applies to State Department and AID employees
 
 
 [1]
 The majority acknowledges that § 628.2(a) unambiguously requires employees to submit material to a review process because that subsection says that material "shall be submitted." Maj. op. at 427. That much makes sense. But my colleagues insist that § 628.2(b) is ambiguous because "it lacks such requirements concerning the publication of unapproved material." Id. That is simply not the case. Subsection (b) says, "No employee shall publish any material of official concern under paragraph a until it has been cleared...." I see no ambiguity
 The majority also gives short shrift to the second sentence of subsection (b): "The purpose of this clearance requirement is to substitute the agency's institutional judgment for the employee's judgment ...." (emphasis added). Maj. op. at 428. In my view, this sentence strongly suggests that these are not suggested changes, but rather that they are mandated.
 
 
 [2]
 The majority offers the following explanation for disregarding the presumption:
 In the case of § 628.2, the uncertainty over the government's constitutional power to authorize punishment for publication of material disapproved by the agency, together with the obscurities produced by interpreting the regulation to authorize such punishment, provide a basis for adopting differing interpretations of "cleared" and "clearance" in §§ 628.2b and 628.2c.
 Maj. op. at 428-429. Neither of those rationales falls within the letter or the spirit of the exceptions articulated in Atlantic Cleaners. Although "uncertainty over the government's constitutional power" may tip the scales in favor of a constitutional reading where ambiguity already exists on the face of a statute, it cannot be used in a boot-strap attempt to create an ambiguity. See Moore Ice Cream, 289 U.S. at 379, 53 S.Ct. at 622. Moreover, the majority has identified no real "obscurities" that arise out of giving the words "clearance" and "cleared" the same meaning in both sections.
 
 
 [3]
 In Atlantic Cleaners, the Court held that "trade or commerce" had a different meaning in section 1 of the Sherman Act, which was based on Congress' plenary power to regulate commerce, compared with section 3, which was based on Congress' authority to enact legislation governing the District of Columbia
 
 
 [4]
 The majority wants subsection (b), which currently reads, "No employee shall publish any material of official concern under paragraph a until it has been cleared " to actually mean "No employee shall publish any material ... until it has been through the review process." If the agency had really intended this meaning it could be expected to use the more natural word "submitted."
 In fact, subsection (a) does say that all materials "shall be submitted ... for clearance...." If going through the process is all that is required, this word could simply have been repeated in subsection (b), thus rendering it "No employee shall publish any material ... until it has been submitted." Thus subsection (a), which uses both "submitted" and "clearance" in the same sentence, is further proof that clearance was not intended to mean merely the status of having "been through the review process."
 
 
 [5]
 The government, perhaps unwittingly, argued in its briefs that the "power that 3 FAM § 628 confides in the agency is that of approval or disapproval of the submitted piece." Brief for Appellees at 14 (emphasis added)
 
 
 [6]
 The VOA apparently provides an appeals process for denials of clearance:
 If final Agency review results in disapproval, the author shall have the opportunity to review this determination with the Director of the Office of Public Liaison and the other reviewing officers, within 5 calendar days of notification of disapproval.
 USIA Announcement No. 38 (Feb. 5, 1988), reprinted in App. 82. One might ask why there is any need for such a detailed review process if the agency intends to make only a take-it-or-leave-it suggestion.
 
 
 [7]
 There is a curious aspect to this case involving what constitutes evidence of the current official agency position. Other than the statements of counsel in briefs and arguments, the only suggestion that the agency will not punish employees for publishing unapproved materials is the eight-year old affidavit of Robert T. Coonrod, the Executive Assistant to the Director of VOA and Acting Director of VOA's Office of External Affairs, prepared in the early stages of this protracted litigation. We do not know whether Coonrod is still at VOA or whether the policy he discusses is still in place
 
 
 [8]
 If the majority's position holds, the employees of VOA will not even have received a clear statement that the agency's past practice was unconstitutional. Moreover, the problem of the validity of this regulation may well re-occur. The FAM regulations apply not just to the VOA, but also the USAID and State Department. The majority cites no case holding that "the interpretation proposed by counsel" during litigation can bind an agency. Maj. op. at 429. Indeed, our precedents appear to point in a contrary direction. See Florida Power & Light Company v. FERC, 85 F.3d 684, 688 (D.C.Cir., 1996) ("the agency runs this regulatory program, not its lawyers; parties are entitled to the agency's analysis of its proposal, not post hoc salvage operations of counsel.") (Williams, J.)
 
 
 [9]
 In past eras, of course, government was permitted to restrict speech on this basis. It used to be the law that:
 [w]ords spoken in derogation of a ... great officer of the realm, which are called scandalum magnatum, are held to be ... heinous; and, ... when spoken in disgrace of such high and respectable characters, they amount to an atrocious injury: which is redressed ... on behalf of the crown, to inflict the punishment of imprisonment on the slanderer.
 
 
 [3]
 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND 123-24 (1768). As the Eighth Circuit succinctly noted, however, since that time, "[a] revolution intervened." Casey v. City of Cabool, 12 F.3d 799, 802 (8th Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 325, 130 L.Ed.2d 285 (1994)
 
 
 [10]
 The same principles apply to punishment for speech. Thus, for example, it is highly doubtful that a career employee of the Department of Labor could be fired for criticizing the President of the United States on grounds unrelated to labor policy. In such a case, the employee/employer relationship would simply be too attenuated, and the employee's rights as a citizen would dominate. The same could not be said for the White House Chief of Staff, however. On the other hand, if the same Department of Labor employee publicly criticized her direct supervisor, she might well be subject to discipline under the Pickering test, for such comments would directly affect the government's interests as employer
 
 
 [11]
 The VOA's charter provides:
 The long-range interests of the United States are served by communicating directly with the people of the world by radio. To be effective, the Voice of America (the Broadcasting Service of the United States Information Agency) must win the attention and respect of listeners. These principles will therefore govern Voice of America (VOA) broadcasts:
 VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective and comprehensive.
 VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of American thought and institutions.
 VOA will present the policies of the United States clearly and effectively, and will also present responsible discussion and opinion on those policies.
 Pub.L. No. 94-350 (1976).
 
 
 [12]
 The government's justifications here are offered for the first time in this litigation. In NTEU, by contrast, Congress had enacted an honoraria ban in response to specific harms identified by the Quadrennial Commission on Executive, Legislative, and Judicial Salaries, and the President's Commission on Federal Ethics Law Reform. --- U.S. at ----, 115 S.Ct. at 1008-09
 
 
 [13]
 The only case cited by the government for the proposition that foreign affairs (as opposed to national security) issues are entitled to any sort of special consideration is Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), a case having nothing to do with the First Amendment
 
 
 [14]
 Weaver did not comply with this requirement and does not dispute here the government's authority to discipline her for this failure
 
 
 [15]
 In Sanjour we said: "It is perhaps the most fundamental principle of First Amendment jurisprudence that the government may not regulate speech on the ground that it expresses a dissenting viewpoint." 56 F.3d at 85. Why then should the government be allowed to examine all employees' manuscripts before publication on the grounds that they might express a dissenting viewpoint?
 
 
 [16]
 Weaver, for example, accused the VOA of sending coded messages to Solidarity activists in Poland via Rod Stewart songs, and criticized the VOA director Charles Wick for using VOA resources for self-glorification, pointing out that the agency had filed nine reports on his activities in the previous year including extensive coverage of a banquet at which he was honored, which provoked the comment from one of her sources: "Is this international news?"
 If Weaver had been warned that these statements were "inaccurate" or drew "improper conclusions" is it reasonable that the VOA could have declined to sanction their publication later without losing face?